SOUTHLAND Co. *v.* AARON, et ux.

May 3, 1954

No. 39138          63 Adv. S. 80          72 So. 2d 161

*Welch, Gibbes & Butts,* Laurel; *Wells, Thomas & Wells,* Jackson, for appellants.

*James D. Hester,* Laurel, for appellees.

KYLE, J.

This case is before us on appeal by the Southland Company, a joint venture composed of E. Constantin, Jr., and others, defendant in the court below, from a judgment of the Circuit Court of the Second Judicial District of Jones County, in favor of Edward R. Aaron and wife, Nellie F. Aaron, plaintiffs in the court below, for the sum of $1,875 as damages alleged to have been sustained

by the plaintiffs as a result of the pollution by the defendant of the waters of a creek which flowed through the lands of the plaintiffs.

The record shows that the appellee, Edward R. Aaron, was the owner of 187½ acres of land lying east of U. S. Highway No. 11 and a short distance north of Sandersville, in Jones County, which was traversed from north to south by Big Boguehoma Creek, a natural watercourse. Approximately 43½ acres of the land, in the northwest corner of the tract, lay west of the creek and fronted on the highway. Aaron's dwelling house and cattle barn were located on this 43½-acre tract. The remaining 144 acres of land, lying east of the creek, was swampy woodland, a part of which was subject to overflow during the winter months, and was neither cultivated nor used for pasturage purposes. Aaron had purchased the land from his wife during the summer of 1950, and had moved on the land in November, 1950. North of Aaron's land a small tributary branch known as McGill's Branch flowed eastwardly into Boguehoma Creek.

The appellant, Southland Company, was the owner of an oil refinery located approximately five-eighths of a mile north of Aaron's land and south of McGill's Branch. The refinery had been erected during the year 1946 for the purpose of refining crude oil and converting the same into marketable products. The crude oil was brought to the refinery and stored, and was then run through the fractionation coils where it was distilled into gasoline and motor fuels. Large quantities of water were used in the refining process for cooling purposes. Waste oil leaking from the pumps was collected in reclamation facilities to prevent waste. A series of traps was provided in the plant with double sedimentation ponds below them, for the purpose of separating the oil from the water. The water then flowed into a sedimentation pond. When the effluent left the plant it flowed into a ditch which emptied itself into McGill's Branch.

The plaintiffs alleged in their declaration that Big Boguehoma Creek had always furnished a permanent water supply for the plaintiffs' land; that its waters prior to the construction of the defendant's refinery were clean, wholesome and healthful, and entirely fit for consumption by man and beast; and that the creek afforded pleasant swimming and fishing facilities, and provided wholesome water the year around for cattle on the plaintiffs' land. The plaintiffs alleged that during the two years immediately preceding the filing of their declaration the defendant had continually permitted poisonous, harmful and deleterious refuse consisting of oil, asphalt, and various chemicals, to escape from its refinery and to flow into McGill's Branch, and thence into Big Boguehoma Creek; that the poisonous refuse thus escaping from the refinery, had contaminated and polluted the waters of the creek so as to render the same unfit for use by man or beast; that the waters thus contaminated and polluted had overflowed the plaintiffs' lands and had caused deposits of such poisonous refuse to be left on the banks of the creek and on the low lands adjacent thereto, thereby damaging said lands and completely destroying the reed cane and pasture grasses near the banks of the creek. The plaintiffs asked for damages for depreciation in the market value of their land and for the loss of their water supply, and also damages to cover the cost of the digging of a well and the installation of an electric pump to provide a water supply for their cattle; also damages for the loss of swimming facilities and fishing rights in the waters of the creek; and the plaintiffs also asked for punitive damages.

The defendant in its answer denied the material allegations of the plaintiffs' declaration. The defendant averred in its answer that the waters of Big Boguehoma Creek had been contaminated since 1944 by the salt waters escaping from the Heidelberg Oil Field situated several miles north of the refinery; and the defendant

denied that it was in anywise responsible for the contamination of the waters of the creek.

Many witnesses testified on behalf of the respective parties and the evidence as to the extent of the contamination complained of was conflicting. The plaintiff, Edward R. Aaron, testified that he had acquired title to the above mentioned tract of land on June 19, 1950, and that he moved on the land in November, 1950, after his retirement from the Navy. He stated that he was engaged in the business of raising registered Hereford cattle. Twenty acres of the 43½-acre tract west of the creek was in a permanent pasture at the time of the trial, and 14 head of cattle were being pastured on the lands.

Aaron testified that the waters of the creek had been contaminated by foreign substances escaping from the refinery during the two years that he had lived on the land. He had made a detailed inspection of the waters of the creek and the waters of McGill's Branch below the refinery. He stated that the effluent from the refinery was discharged into a ditch which ran northwardly approximately ¼ mile and emptied into McGill's Branch, which flowed into the Big Boguehoma Creek a short distance above his own land. Aaron testified that he had examined the waters of the creek above the point where McGill's Branch emptied into the creek, and he did not find those waters contaminated. He had also examined the waters of the branch above the point where the refinery ditch emptied into the branch, and the waters of the branch were clear. He stated that the effluent which was discharged from the refinery and which found its way into the creek had the appearance of something like oil-slick. It floated on top of the water; "has a sort of fluorescent sheen in it," and "if you stick your finger in it and put it in your mouth, it has an oily taste to it. . . . It is greasy to touch, and feels sort of sticky." He had seen globules of oil come out from the soil on the banks of the creek and run down into the stream. The contamination appeared to be worse in the summer

time than during the winter. He testified that he had fenced his pasture land off from the creek, and that he had installed a well and an electric pump to furnish water for his cattle, and had erected a fence along the west bank of the creek, as a part of his pasture enclosure. He admitted, however, that the well had been dug and the fence erected during the summer of 1950, before he actually moved on the land and before the beginning of the two-year period mentioned in his declaration. He stated that he had not used the 144 acres of land lying east of the creek for pasturage purposes because he had no water supply; and he had been unable to fish in the creek since the waters of the creek were contaminated. He stated that he had complained to J. R. Cox, the superintendent of the Southland Company, during the month of October, 1952, about the contamination of the waters of the creek, and that Cox said to him: "I know there has been oil running down there, but we have made an attempt to correct it. I know there is a fluorescent sheen running down there, but that won't hurt anything." He stated that the land east of the creek was suitable for pasturage during the summer months, but he had been unable to use the same because he had no water supply on that side of the creek.

Aaron admitted that no damage had been done to the improved pasture land west of the creek or the grasses on the pasture land by the foreign matter in the creek. His cows had never had an opportunity to drink water out of the creek, because his pasture land was fenced off from the creek. But he estimated that the water overflowed from the creek for a distance of fifty yards in some places; and in his opinion the oily substance in the water would in time damage his land.

Aaron's testimony concerning the pollution of the waters of the creek during the two-year period was corroborated by the testimony of other witnesses who testified for the plaintiffs.

J. R. Cox, plant superintendent of the Southland Company who was a graduate chemist, testified that the crude oil was brought to the refinery through pipe lines or in tank cars. He then described the fractionating process. He stated that there was only a small amount of chemicals used in the process. Only a small amount of caustic soda was used to wash the gas. Cox stated that there was no waste of the crude oil and there were no waste products from the fractionating process, but there was evidence of caustic soda deposited in the effluent.

Cox stated that on February 9, 1951, a break occurred in the pipe line, and 400 barrels of oil escaped into the ditch and into the branch, and thence into Boguehoma Creek. Work crews were employed about a month in the recapture of the oil. Nine different traps were thrown across Boguehoma Creek on the south side to catch the oil. The refinery spent $8,000 dollars in cleaning up the oil that escaped. Cox stated that a controlled laboratory was maintained at the plant, and that frequent tests were made of the effluent that flowed from the plant. The tests had never shown more than 700 parts per million sodium chloride in the effluent flowing from the plant into McGill's Branch. The waters of Boguehoma Creek above the point where McGill's Branch entered the creek, showed 1827 parts per million of salt. He stated that he did not know of anything in the effluent that would be detrimental to life. He had never seen scum on the creek except in the summer time after a long drought. He admitted that after the break occurred in the pipe line in 1951 oil which had floated against the banks continued for a considerable period of time to contaminate the waters of the creek. He stated that the water of the creek flowing from the Heidelberg Oil Field was generally salt water, and that cattle would not drink salt water.

J. B. Price, of the Chemistry Department of Millsaps College, testified that he had collected samples of the water in McGill's Branch, at a point below the refinery,

and samples of the water in Boguehoma Creek, above and below the mouth of McGill's Branch. The sample taken from McGill's Branch showed 114 parts per million of sodium chloride. The sample taken from Boguehoma Creek, a short distance above the mouth of McGill's Branch, showed 1510 parts per million of sodium chloride, and the sample taken from the creek just below the land owned by the plaintiffs showed 1368 parts per million of sodium chloride. The witness stated that he did not observe the presence of any petroleum products in McGill's Branch or in Boguehoma Creek. He saw no evidence of oil deposits on the roots of trees on Dr. Copeland's land, which adjoined the land of the plaintiffs. He admitted, however, that the samples of water that he had taken were taken below the surface, and that oil would not go down and mix with water.

The first point argued by the appellants as grounds for reversal on this appeal is that the appellees failed to prove the presence of ''oil, asphalt and various and sundry chemicals'' in the watercourse, or that the appellant had released such substances into the watercourses, including the creek which flowed through the appellees' land.

██ We think that there was sufficient evidence to show that the waters of the creek were polluted by the effluent discharged from the appellant's plant. It was admitted by the appellant's witnesses that the oil had escaped in large quantities during the month of February, 1951, and that the waters of Boguehoma Creek were completely polluted at that time. The testimony relating to the pollution of the waters of the creek thereafter was conflicting. But Aaron made his complaint to Cox in October, 1952; and Aaron testified that the pollution continued until the time of the trial. This conflict in the testimony presented an issue of fact for the determination of the jury.

██ The general rule relating to the rights of a riparian proprietor to have the water of the stream come to

him for its natural purity is stated in 56 Am. Jur., p. 826, Waters, par. 405, as follows:

"One of the cardinal rights of a riparian proprietor is to have the water of the stream come to him in its natural purity, or in the condition in which he has been in the habit of using it for the purposes of his domestic use of his business, and any wrongful pollution, defilement, or corruption of the water, which prevents its use for any of its reasonable or proper purposes, constitutes an actionable infringement of such right. It is the generally accepted doctrine that a riparian owner sustaining substantial injuries by reason of such an invasion of his rights may maintain an action without regard to the motive which prompts the invasion, and the pollution of a stream to the injury of a lower proprietor will not be justified by the importance of the business of the upper proprietor to either the public or the wrongdoer, or by the fact that the latter is conducting such business with care and in the only known practicable mode."

In the case of Mississippi Mills Company v. Smith, et al., 69 Miss. 299, 11 So. 26, 30 Am. St. Rep. 546, the appellees brought suit to recover from the appellant damages for polluting the waters of a small stream which ran across their land. The proof showed that the defendant company, more than 20 years before the suit was filed, had erected a cotton and woolen mill at or near some springs from which one of the branches of the stream took its origin, and had dug a pond about the springs, and dammed up the water that the springs supplied, and with a large pump forced the water from the pond into its dyehouse and through the closets in its mills. The water, having been used in flushing the closets and in dyeing the cloth manufactured and washing the wool used by the company, was returned to the stream, below the pond, and from thence flowed into the stream on the plaintiffs' land. The Court, in holding that the defendant company was legally liable for the pollution of the stream, said:

"In this case, the defendant company, using water in which it had a limited right, and to which the plaintiffs, after a reasonable use thereof by the defendant, had an equal right, by artificial means changed the very nature and character of the water, and, instead of permitting it to flow to the plaintiffs in beneficial condition, poured it upon them, according to their witnesses, poisoned and putrescent.

"For this, a right of recovery manifestly existed, unless the defendant had acquired the right by prescription so to do. The verdict of the jury settles that claim against it."

The next point argued by the appellant's attorneys is that the appellees failed to prove negligence on the part of the appellant. It is true that the plaintiffs in their declaration alleged that the poisonous and deleterious refuse was negligently discharged into the stream by the defendant and its employees. But a careful study of the declaration leads us to the conclusion that negligence in the operation of the refinery was not the gravamen of the plaintiffs' action. See Beam v. Birmingham Slag Co., 243 Ala. 313, 10 So. 2d 162. The injury complained of in this case was the operation of the refinery in such a manner as to constitute a nuisance. A nuisance is defined in Black's Law Dictionary as "Anything that unlawfully worketh hurt, inconvenience or damage. 3 Bl. Comm. 216." "A private nuisance was originally defined as anything done to the hurt or annoyance of the lands, tenements, or hereditaments of another. 3 Bl. Comm. 216." The gravamen of plaintiffs' action rests upon the maxim "Sic utere tuo ut alienum non laedas." Negligence, as alleged in the plaintiffs' declaration, is used in the broad sense of lack of due care in the use of the defendant's property to avoid injury to the plaintiffs' property.

The rule relating to proof of negligence in nuisance cases is stated by the text writer in 66 C. J. S., p. 756, Nuisances, par. 11c, as follows:

"Where negligence is not an element of a nuisance, the rules governing the sufficiency of complaints for negligence have no application in actions for nuisances. Thus, ordinarily, negligence need not be alleged or proved. Moreover, even though it is averred that the acts complained of have been done negligently, it does not make negligence a material question; and, if negligence is alleged, such averments may be disregarded as surplusage."

In the case of Southeastern Express Co. v. Namie, 182 Miss. 447, 181 So. 515, the Court said: "The rule is fundamental, of course, that when a plaintiff has alleged and proved the facts essential to a recovery, he is entitled to judgment. It follows that it is unnecessary to allege or prove more, and that if more than enough be alleged, the unnecessary allegations will be treated as surplusage."

The next point argued by the appellant's attorneys is that the court erred in granting appellant's Instruction No. 12. The appellant contends that the instruction is misleading and confusing, and that the giving of the instruction constitutes grounds for reversal of the judgment of the lower court. The language complained of is indeed garbled; and the instruction should not have been granted. But it is not likely that the jury was misled by the instruction; and for that reason we would not be justified in reversing the judgment of the lower court on account of the giving of the instruction. Meridian Sanatorium v. Scruggs, 121 Miss. 330, 83 So. 532; Neely, et al. v. City of Charleston, 204 Miss. 360, 37 So. 2d 495.

It is next argued that the court erred in granting plaintiffs' Instruction No. 3. The criticism of the instruction is that the opening clause of the instruction constitutes a comment on the weight of the evidence. The clause referred to is as follows: "The court charges the jury for the plaintiffs that a permanent supply of running water is a valuable asset in the cattle industry." The

language complained of is argumentative, and we think that the instruction should not have been granted. But again we say that the granting of the instruction did not constitute reversible error.

It is next argued that the court erred in granting plaintiffs' Instruction No. 5. But we think that there was no error in the granting of that instruction.

It is next argued by the appellant's attorneys that the amount of the verdict is so grossly excessive as to indicate bias or prejudice on the part of the jury. This contention has given us more concern than any other contention made on this appeal. In none of the instructions granted to either of the parties was the jury furnished a guide as to the measure of damages that the plaintiffs might be entitled to recover. Aaron's testimony did not show a permanent injury to the land, and under the rule laid down by this Court in the case of Mississippi Mills Company v. Smith, et al., supra, the plaintiffs were not entitled to recover as an element of their damages the alleged difference in the value of their farm with a clear stream on it and with that polluted as it was.

Aaron's own testimony negatived the idea that his land had been permanently damaged as a result of the pollution of the stream. Aaron admitted that there had been no actual damage to the timber, and that none of the water had overflowed any part of the permanent pasture lying west of the creek. Aaron also stated: "I don't know that they have damaged the soil, grass will probably grow there, but my contention is this, if the oil continues to come down the stream every time it floods, it will get on the grass, soil and everything . . . and over a period of time it will create cumulative damage to my land." It appears from Aaron's testimony that if the pollution complained of were discontinued, there would be no permanent injury to the land. Under these circumstances the measure of damages which the plaintiffs were entitled to recover, if any, was the depreciation in the rental value, or the depreciation in the value

of the use of the property, during the two-year period, and such special damages as the plaintiffs may have been able to prove.

■■■ In discussing the measure and the elements of damages in an action of this kind, the textwriter in 56 Am. Jur., p. 841, Waters, par. 422, states the rule as follows:

"It is the general rule that where the injury caused by the pollution is permanent and irreparable, the measure of damages is the difference in the market value of the property before and after the creation of the nuisance But if the injury resulting from the pollution is of a temporary character, or if the nuisance is a temporary or abatable one, the measure of damages is the depreciation in the rental value of the property caused by the nuisance. . . .

"In the assessment of damages for the pollution of a watercourse, a riparian owner who has been injured is not limited in his recovery to the actual loss by depreciation in the market or rental value of the property, but it is proper to consider the impairment of his comfortable enjoyment of the property, together with such other special damages as may be proved. The loss of water by reason of the pollution, the injury to the land by impoverishment of the soil, the damage to crops, and various other injuries to property, have been held to be elements of recovery."

In the case of Hodges v. Pine Product Co., 135 Ga. 134, 68 S. E. 1107, 33 L. R. A. (N. S.) 74, the plaintiff brought suit against the defendant to recover damages for the wrongful pollution of a creek running through the plaintiff's stock farm. The plaintiff alleged in his declaration that the waters discharged into the creek from the defendant's wood rosin and turpentine plant located only a short distance from the plaintiff's farm had been poisoned with chemicals extracted from wood at the plant, and that the flow of the poisoned waters into the creek had polluted and adulterated the waters of the creek,

rendering the same unfit for the stock of the plaintiff to drink.

The Court, after commenting upon the items of special damages alleged, in its opinion said:

"If, by reason of the conduct of the defendant in polluting the stream, the land was rendered unfit or less valuable for use as a pasture, or other purposes for which it was adapted, with the stream running through it unpolluted, in the absence of other items of special damages, the measure of damages of the owner would be the diminution in the market value of the property, if the injury was of a permanent nature, or the diminution in the rental value, if the injury was of a temporary nature."

The injury complained of in the case that we have here was not shown to be of a permanent nature. If the pollution of the stream were discontinued, there would be no further cause for complaint, so far as the appellant is concerned. The appellees were therefore not entitled to recover damages for permanent depreciation in the value of their land as a result of the nuisance complained of. But the appellees were entitled to recover damages for the diminution in the value of the use of their land during the two-year period referred to in the declaration, to the extent that such diminution in the value of the use of the land was proximately caused by the wrongful act of the appellant, and also such special or incidental damages as they might be able to prove. 66 C. J. S., p. 978, Nuisances, par. 175. As stated by the Court in the Mississippi Mills Company case, "It must be assumed that the defendant will cease to infringe upon the rights of the plaintiffs; and, if it does not, recovery must be had in successive suits."

The appellant's proof tended to show that the waters of the creek had already been polluted by salt water escaping from the Heidelberg Oil Field before the contaminated waters from the refinery found their way into the creek; and the court very properly instructed the jury that, if this were true, the appellant would be liable only

for its proportionate part of the damages inflicted upon the appellee's land as a result of the combined but independent acts of the appellant and other parties who may have contributed to the pollution of the stream. Masonite Corporation v. Burnham, et al., 164 Miss. 840, 146 So. 292, 91 A. L. R. 752; Masonite Corporation v. Steede, 198 Miss. 530, 21 So. 2d 463.

■■ ■■ The court erred in refusing to instruct the jury that the plaintiffs were not entitled to recover as items of special damages the costs incurred by them in drilling the well and installing the electric pump. The well was installed during the summer of 1950 for the purpose of supplying water for the plaintiffs' household uses and for the plaintiffs' cattle. The plaintiffs had a right to show that it was necessary for them to water their cattle at the well because of the contaminated condition of the waters of the creek; but they were not entitled to recover the cost of the well as an element of damages.

The appellants have argued two or three other points in their brief relating to the admission of testimony concerning the value of the land. But in view of what has been said above it is not necessary that we discuss those points in detail.

For the reasons stated above the judgment of the lower court is affirmed on the question of liability, but it is reversed on the question of damages; and the cause is remanded for a new trial on the question of damages only.

Affirmed as to legal liability and reversed on the issue of damages and remanded.

*Roberds, P. J.,* and *Hall, Holmes* and *Gillespie, JJ.,* concur.