MAGNOLIA PETROLEUM COMPANY *v.* STINSON

No. 40429          March 18, 1957          93 So. 2d 815

534

*Earl A. Brown, Chas. B. Wallace,* Dallas, Texas; *Brunini, Everett, Grantham & Quinn, George P. Hewes III,* Jackson, for appellant.

*R. L. Netterville,* Natchez, for appellee.

Lee, J.

Glen A. Stinson sued Magnolia Petroleum Company, a corporation, and Petersen Drilling Company, in the county court, to recover for damages to his sheep, cattle and pasture from the alleged negligent pollution of his water supply. Issue was joined and the county judge sat as both judge and jury. When the plaintiff rested, a peremptory instruction was granted to the drilling company, the driller of the well in question, because it had already been released by the owner prior to the injury complained of. At the conclusion of all of the evidence, the court found for the plaintiff and assessed his damages at $3,000.00. On appeal, the circuit court affirmed; and the Petroleum Company brings its appeal here.

The plaintiff, in 1952, was engaged in farming on the Wayside Plantation in Adams County. He had two pastures. In one, he was grazing 50 dairy cows and 256 sheep; and in the other he had 17 registered sheep.

For his water supply, Stinson depended on a small stream, which flowed across both pastures. Normally it was from 2 to 4 inches deep and 6 to 8 feet wide. Its source was northwest of Stinson's place and it was fed by springs. A short distance north of Stinson's property, the defendant, on February 4, 1952, completed the McShane No. 1 Oil Well. A gully led from the oil well to this small stream.

The plaintiff's case was developed as follows: On or about the 20th day of Febraury, 1952, Stinson and several helpers went to see about his sheep. He was checking them several times daily because it was about lamb-

time. That morning he found one dead sheep and a large number sick. It had been raining for a day or two and he observed a mud formation in the stream passing through the pastures. A Mr. Land, production man for the defendant, came along and suggested that Stinson get a veterinarian. This he did immediately, securing Dr. Hagen Peters, a graduate of Alabama Polytechnic Institute.

Dr. Peters, on arrival, performed a post-mortem examination on the dead animal, saw another aborting, and observed that others were sick. From the post-mortem, he was able to tell that there was a complete fatty degeneration of the liver. It was evident to him that the trouble was not caused from an infectious disease. He was positive that poison was present.

After Stinson had observed the muddy formation in the stream, he, Lewis Bassett and Leon Hutchins set out, walking up the stream, to find out where the formation was coming from. They traced it to the location of the McShane No. 1 Well. A large pit, used for mixing different drilling muds, 10 to 15 feet wide and 20 to 30 feet long, situated on an incline, was draining and overflowing into the gully, and running thence into the stream which was flowing through the pastures.

Stinson testified that he saw bags of all sorts of drilling chemicals at the well. Some had been opened, used and stacked. About a half truck load had not been used. Some of those bags were soft from the rain and had burst open and the chemicals were scattered all over the ground. The place had not been cleaned up. The pit had no levee around it. He said that this formation was running down through the gully into the stream and on into his pastures. He further said that he related this fully to Mr. Land, agent of the defendant, who gave assurance that he would attend to the matter at once.

Dr. Peters suggested that a sample of the water should be obtained for analysis. Lewis Bassett took a glass

jug, waded into the center of the stream, filled the jug with water and put the lid on it. Dr. Peters sealed it with adhesive tape and Stinson put it under lock and key. It was finally sent by Dr. Peters to Mississippi State College for chemical analysis.

O. U. Walling, chemist at State College, testified that he received a bottle containing a liquid content from Dr. Peters on April 28, 1954. The breakdown of his analysis was as follows: "Well, I found it to be essentially a solution of sodium dihydrogen phosphate. I found 24.20% sodium dihydrogen phosphate in the water. That was based on the termination of the phosphate. The PH of the water was 5.2, which is indicative of a slightly acidic condition, and it had a specific gravity of approximately 1.223 which, of course, would indicate quite a bit of dissolved substances in it. I found phosphorous present and when expressing the PH as $H^2 O^5$ it analyzes 14.32% and the phosphorous content was calculated to sodium dihydrogen phosphate, it becomes 24.20%."

When asked if the chemicals, shown by his analysis, were the chemicals used in drilling muds, he said that he could not be certain, but "I know that a compound of salt is used to bring up the gravity of the mud. Whether this is always used, or commonly used, I could not say." He said that the specific gravity of the water was 1.223 and was indicative of a high concentration in the water. He said that most any compound of salt in excessive amounts is toxic. When asked if the contents, which he found, would be poisonous to sheep, he did not wish to pose as an expert on that question. However, when counsel for the defendant asked if he would say that this was in excessive amounts, he replied, "In my opinion, it is."

Dr. Peters testified that the sheep had diarrhea, vertigo, loss of coordination, fatty degeneration of the liver, kidney damage, and a sloughing of the first of the four stomachs, roumin. Each of the animals that died had the

same symptoms and conditions, and this was true also as to those which were sick and did not die. The complete fatty degeneration of the liver is caused not by infectious disease, but by a very toxic agent. He was positive that a poison was present. The diarrhea, vertigo, and aborting all go along with fatty degeneration of the liver. The post-mortem lesions and the way the animals acted led him to believe that they had phosphate poisoning. He made microscopic tests. He did a post-mortem, but not an autopsy. The doctor expressed his opinion by his answers to questions as follows: "Q. Now doctor, if the drinking water in a stream contained a PH of 5.2, indicative of a slightly acid condition, and had a specific gravity of approximately 1.223, which was indicative that there was quite a bit of dissolved substance in the water, and the phosphorous as $H^2 O^5$, which analyzed, is 14.32, of dihydrogen phosphate, it becomes 24.20%, if consumed by sheep, in your opinion, would it be fatal, in the event that the sheep drank this and later died? A. That, of course, would depend on the amount that they drank. Ruminants ordinarily drink great volumes of water. I should think yes, it's perfectly capable of causing death. Q. Assume that there were approximately one hundred sheep in the herd, heavy burdened with lambs, which were almost ready to be born, and they consumed the same contents and the same water, and later all aborted, now do you have an opinion as to whether the water they drank containing the substances that I have set out, would be the cause of their aborting? A. In my opinion, it certainly would be, because one of the things that we learned early in medicine, is that acid is abortive. That would be true, it would seem."

The doctor said that sodium dihydrogen phosphate would be more likely to kill faster and more acutely because it is more absorbable. Sheep drink from 5 to 10 gallons of water a day and the concentration was definitely sufficient to cause sickness and death. It was his

opinion that the sheep had been getting this polluted water a day or two. He attended the animals for nine days. While he did not see them drink the water, he was satisfied with his examination, and said, ''I certainly would know most probably what did kill them.''

For the defense, William G. Spence, a chemist with the Game and Fish Commission, in charge of water pollution, testified that he checked the water for its acid and alkaline condition on February 22, 1952. At that time it was normal. He said that he made an examination of material in a sack at Stinson's milk barn and found it on the acid side. He examined the location at the McShane No.1 well and found it sloppy. He saw a couple of sacks containing material that appeared to be caustic. There was a number of empty sacks around the place in the mud. In the pits he found a conglomeration of mud and water. He did not test the PH of the pits. While he did not go around the pits on all sides, he saw that the little pit had sloshed over at the end at the time of his visit. He ran a PH on the sacks that looked to be caustic, and said that whether this substance, washing down stream for half of a mile, would have a PH of more than 7 would depend on the amount of the water with which it was mixed and the amount of the substance. He of course could not say that the contents of the other sacks had not washed down the stream before his visit.

Lewis L. Harrison, the pumper on this well, was confused about the time that the large pit overflowed. At first he said that it occurred between 10:30 of the 19th and 5:00 o'clock of February 20th. Then under questioning by defense counsel, he changed the date to January instead of February, Finally, he ended up by saying that he did not know the day on which this occurred. He then said that the pit ''backfilled'' on the morning of the 20th at 7:00 o'clock and it was reported to him that it was running over.

By the evidence of Michael McKay, a district land man for the defendant, there was an attempt to impeach Dr. Peters to the effect that the doctor told him that he had made no post-mortems or analysis of the organs of the sheep, and that no sample of water was taken. (The doctor had previously testified that he had never seen this man).

Roland Stacy testified that several days before this occurrence, he examined the nearby Roeser & Pendleton well, a dry hole, to see about fixing it. He saw a few sacks lying around at the time. He said that the reserve pit was broken and washed out. It was his opinion that, with a few rains, if there had been anything around those premises that would kill a sheep, it could have washed out into the stream. However, Stinson had previously testified positively that there was no seepage or overflow from this dry hole.

Simply stated, the plaintiff's evidence amounted to this: The only source of water to his sheep was the spring branch. Presumably they drank from this branch. The owner discovered them sick and dying. He noticed a muddy formation in the stream, and traced it to its source, namely the McShane No. 1 well. There he observed bags of drilling chemicals soft from the rain, burst open and scattered over the ground. There was no levee around the pit. It was overflowing, and the overflow was carrying these chemicals into the gully and thence into the stream from which his sheep would drink. He took a sample of the water, which, on analysis, showed a high content of sodioum dihydrogen phosphate, in excessive amounts. A veterinarian, a competent authority, who made a post-mortem and microscopic examinations and who attended the sheep for 9 days, was positive that they were not victims of infectious disease. On the contrary it was his opinion that the condition of the sheep resulted from their drinking water with an excessive content of phosphate.

A case such as this may be established by circumstantial evidence where "the circumstances are such as to take the case out of the realm of conjecture and place it within the field of legitimate inference." Johnston v. Canton Flying Services, 209 Miss. 226, 46 So. 2d 533. See also 38 Am. Jur., Negligence, Sec. 333, p. 1032; Palmer v, Clarksdale Hospital, 206 Miss. 680, 40 So. 2d 582.

In Gulf Refining Co. v. Davis, Miss., 80 So. 2d 467, it was held that whether or not the oil company negligently permitted salt water to seep or overflow from its pits onto the lands of the plaintiff, the surface owner, was for the jury.

In Southland Company v. Aaron, 221 Miss. 59, 72 So. 2d 161, it was held that whether the water of the creek, which flowed through plaintiff's land, was polluted by the discharge of effluent from defendant's oil refinery, located upstream, was, under conflicting evidence, an issue of fact for the jury. The opinion cited with approval from 56 Am. Jur., Waters, Sec. 405, p. 826, which recognizes the right of a riparian owner to have the water of the stream come to him in its natural purity or in its accustomed condition for his domestic use, and that its pollution, defilement or corruption constitutes an actionable infringement of such right. See also The Southland Co. v. McDonald, (Miss.) 82 So. 2d 448.

There is considerable factual similarity between this case and the case of Masonite Corp. v. Guy, 223 Miss. 8, 77 So. 2d 720. In that case, appellee, a commercial fisherman, sought to recover for the loss of minnows which died in his traps as a result of the pollution of the stream by effluent from the appellant's plant. There it was said: "Appellee and his witnesses traveled all the way up these streams to appellant's plant and picked up samples of the fiber along the way up to and including the point where appellant's settling ponds empty into Tallahala, and the evidence shows that no fiber was

found above that point." The defense in that case was that the pollution, if any, came from other sources. The Court held that the evidence was sufficient to make an issue for the jury as to whether the effluent from the appellant's plant caused or partially caused the damage. In the case here, the evidence for the plaintiff traced the defiling substance to its source at the appellant's oil well.

■■■ The appellant contends that the appellee failed to prove that the slush pits at the McShane No. 1 well contained any substances that would cause damage to the sheep, or that the chemical substances found in the stream came from the pits of that well, or the cause of the sickness or death of the sheep, or any negligence on the part of the appellant; that it was entitled to a directed verdict, and that the verdict was against the overwhelming weight of the evidence; that the evidence as to damages was indefinite and speculative, and that it is entitled to a reversal and judgment here, or, in any event, to a reversal and remand for a new trial. It cites the line of cases of which Masonite Corp. v. Hill, 170 Miss. 158, 154 So. 295, and Seven Day Wholesale Grocery v. Jarvis, 202 Miss. 446, 32 So. 2d 253, are representative.

In the Hill case, supra, the appellee, in good health, on a June day, went bathing in Tallahala Creek, about 40 to 50 miles south of Laurel, where the appellant's plant was located. Soon he had burning sensations on his feet and where his body was touched by the water. A doctor diagnosed his trouble as resulting from a poisonous irritant. The opinion pointed out that it was incumbent on the appellee to prove that the water contained poisonous elements which caused the injury, and that this was capable of proof by a chemical analysis of a sample of the water, taken from the place where the alleged injury occurred within a reasonable time thereafter. But this he did not do. The opinion, in dealing

with the rule that an essential inference to establish liability may not be based upon another inference, observed that this rule applies, strictly speaking, to presumptions and not to inferences deduced from the facts. The Court said that, in dealing with this principle, two admonitions would be kept in mind, namely, (1) "we must, in allowing inference upon inference, do so with the firm limitation that the probabilities thereby permitted to be entertained are safe and dependable probabilities, measured by legal standards, * *", and (2) "We should do so no further than the reasonable necessities of the case, in the interest of justice, require." The rationale for refusal to uphold liability was the failure of the appellee there to present positive or demonstrative evidence, of which he could have availed himself, if he had taken a sample of the water and subjected it to an analysis. That inherent weakness does not exist in the present case. A sample of the water was taken. It was analyzed and the result thereof was offered in evidence.

In the Jarvis case, supra, it was claimed that the three heifers and the horse died from cotton poison, which had been dumped over a bluff and into a gulch 30 feet deep. The heifers were found 70 to 80 steps from the bluff, but there were no tracks toward the bluff to show that the heifers had been to the poison. The horse got sick at the point where the dead heifers were found. There was no after death bodily deformity indicating death by poison, as against other possible causes. The testimony of the plaintiff showed affirmatively that the animals did not eat poison. The only competent witness for the plaintiff said that a chemical analysis of certain organs of the body was the only way to determine if the animals died of this arsenic poison. In other words, the Court held that mere proximity of the cattle to poison was not enough to meet the burden required of the plaintiff. A comparison of the facts in that case with the facts in

the present case shows that the two cases are altogether different.

The appellant knew, or it should have known, that if it permitted harmful substances to overflow from its well site into the nearby gully, such substances, in turn, would flow into the stream, which ran through the pastures, and would thereby become a source of danger to the plaintiff's live stock. The result was foreseeable, and should have been provided against. Consequently the Court was warranted in finding that a failure to do this was negligence.

The plaintiff offered proof that one registered ram, of the value of $175.00, and 15 large carry-over ewes, each of the value of $30.00, died. He also said that he lost 7 good Hampshire grade bred ewes, although the record as to their value is not clear. He testified that a ewe, pregnant with lamb, is worth $10.00 more than if she is not with lamb; and that he lost 96 of such unborn lambs. The sheep that lived were stunted and lost weight, which, at first, he estimated at 5,000 pounds, of a value of $.25 a pound. Later he referred to this item as of a value of $750.00. His labor in attending the sick animals amounted to $50.00, medicine and drugs cost $84.00, and he was obligated to pay $350.00 to Dr. Peters for his services. There were several other questionable items of damage.

Veterinary services and the cost of medical treatment and attention, the value of livestock killed, aborted lambs, and the depreciation in weight or in the value of livestock injured may be taken into consideration in determining damages for the pollution of a stream. 49 A. L. R. 2d, Damages-Pollution of Stream, Sec. 21(a), p. 295; ibid., Sec. 22(a), p. 296; ibid., Sec. 22(b), p. 298; ibid., Sec. 23(a), p. 298.

Using the lower value for loss in weight, the damage would aggregate $2,819.00, not including the 7 Hampshire ewes. Using the higher value for loss in weight, the damage would aggregate $3,319.00, not in-

cluding the Hampshire ewes. These ewes of course were worth something, and the trial judge evidently put them in the same category as the 15 carry-over ewes, which were shown to be worth $30.00 each. Since the verdict and judgment were for $3,000.00, there is no substantial basis on which it can be said that the award is excessive.

Due consideration has been given to all points argued by the appellant. We find no reversible error in the record and the cause is therefore affirmed.

Affirmed.

*McGehee, C. J.,* and *Hall, Kyle* and *Holmes,* JJ., concur.