468 So.2d 72 (1985)
Tom R. PHILLIPS, Jr.
v.
DAVIS TIMBER COMPANY, INC.
No. 54706.
Supreme Court of Mississippi.
May 1, 1985.
*73 J.B. Van Slyke, Jr., Hattiesburg, for appellant.
Jon Mark Weathers, George E. Dent, Aultman, Tyner, McNeese, Weathers & Gunn, Hattiesburg, for appellee.
Before ROY NOBLE LEE, P.J., and HAWKINS and PRATHER, JJ.
ROY NOBLE LEE, Presiding Justice, for the Court:
Dr. Tom Rhea Phillips, Jr. filed suit against Davis Timber Company, Inc., (Davis) to enjoin it from polluting Phillips' lake and for damages as a result of pollution. After hearing the evidence, which consists of sixteen (16) volumes, the lower court entered judgment for Davis and dismissed the bill of complaint. Phillips appeals and assigns seven (7) errors in the trial below, but we discuss only three (3) assignments, which are dispositive of the appeal:
(1) The lower court erred in finding that at least on two occasions there had been a discharge of pentachlorophenol and disregarded the doctrine of nuisance.
(2) The lower court erred and was manifestly wrong in finding for the appellee when both the appellant's and appellee's sediment samples reflected the presence of dioxins in the lake of appellant.
(3) The weight of evidence was contrary to the findings of the lower court.

Facts
Appellant constructed a lake about one mile north of Hattiesburg in 1964. The lake was made by damming the open ends of an abandoned horseshoe on the Bowie River and by letting the riverbed fill with waters from Mineral Creek, which flowed naturally into the area. Mineral Creek originates about three (3) miles south of Phillips' lake, a short distance from Davis. It passes along the eastern border of Davis through Country Club Lake Estates Lake (Country Club Lake), located about one-half (1/2) mile from Davis, then meanders about two and one-half (2 1/2) more miles past a Southeast Mississippi Power Electric Association operation, a bulk plant, under U.S. Highway 49, and eventually into Phillips' lake.
The Bouie River flows north to south along the eastern border of Phillips' lake. On at least three occasions, the Bouie River has overflowed its banks and inundated Phillips' lake with its waters.
*74 Davis is a wood treating operation. It takes tree trunks, debarks them when necessary, and pressure treats them with a solution of pentachlorophenol (commonly known as "penta" or PCP), the finished product being a preserved wooden pole. The by-product of each pressure treatment, that portion of the solution not absorbed by the poles, consisting mainly of the penta, oil and water, was funneled off into a holding waste pond.
The holding pond was about 5 acres in surface area and approximately 16 feet deep. Through one wall of the pond was a 6-inch pipe, capped on the outside, extending into the pond and then turned vertically to a level about 4 feet from the bottom of the pond. This pipe was placed for emergency draining purposes. In the event the pond had to be lowered, the placement of the pipe in this manner would allow removal of the least toxic water, since the most toxic water would be found at the top and bottom layers of the pond.
After heavy rainfalls in December, 1974, Chuck Davis of Davis, determined that it was better to open the drainpipe and drain some of the pond rather than let the rain cause the top layer of the waste pond to flow over and into Mineral Creek. Davis was unable to recap the drainpipe after it had been opened and the entire pond (except approximately four feet) was drained. Shortly after this occurrence, a fish kill was investigated by the Miss. Air & Water Pollution Control Comm'n (MAWPCC) in Country Club Lake. It was determined that the draining of the holding pond was the cause of the fish kill and charges were brought against Davis, which was fined and ordered to cease further discharge.
In September, 1975, Dr. Richard Pierce, from the University of Southern Mississippi Institute of Environmental Science, began a study under an Environmental Protection Agency grant on the "fate and effects of pentachlorophenol in a fresh-water ecosystem." This study centered primarily on Country Club Lake.
On December 28, 1976, the MAWPCC investigated a second fish kill in Country Club Lake. Again, it was determined that Davis was the cause. MAWPCC requested that Davis file for a permit to operate its waste water disposal system, which would necessitate Davis refining its waste water treatment plant. The data from the December 28, 1976, spill was sent to Dr. Pierce who concluded that the fish in Country Club Lake had died from acute PCP poisoning.
Between January 26, 1977, and April, 1977, Davis applied for a permit from the MAWPCC, and after submitting an engineering report recommending a forced spray evaporation from the waste water treatment pond, a permit was issued for "no discharge."
On February 2, 1978, MAWPCC investigated another fish kill in Country Club Lake. Again, Davis was determined to be the cause and was again fined.
MAWPCC investigated yet another fish kill in Country Club Lake on January 24, 1979. Also, an investigation was conducted on a fish kill in Phillips' lake. Davis admitted releasing water from the holding pond and was fined.
In the 12 months which followed, Davis attempted to comply with orders of the MAWPCC concerning evaporation of waste water from its treatment pond. No solution seemed to work, so Davis began hauling water off to the Hattiesburg City Sewer System. By November, 1980, Davis had filled in its waste water treatment pond, and had implemented a different type of treatment system wherein by-products were reused in the wood treatment process. In January, 1981, MAWPCC received another report that a brown substance had been released from Davis. MAWPCC investigated and found an oil material floating on the creek approximately one-half mile from the plant containing concentrations of oil several inches thick floating on top of the water. Samples were taken, which were found to contain large amounts of pentachlorophenol. No action was taken at that time by the Commission.
*75 Phillips first became aware of a problem with his lake in 1979. When he determined that it had been contaminated, he no longer let his friends and members of the community fish or swim in the lake. Fishing memberships were returned because Phillips was afraid of the long-term effects related to eating the contaminated fish.
Several scientists testified for both sides as to the effects of the pentachlorophenol on Country Club Lake and Phillips' lake. All found evidence of PCP in the lakes, though differed as to whether or not the levels of PCP discovered were harmful to the fish or to humans. Witnesses for appellee stated that perhaps some other cause besides the PCP had accounted for the fish kills.
Witnesses for appellant, primarily investigators from the Bureau of Pollution Control, testified as to the results of their investigations on the fish kills. R. Cooley testified it was his opinion that the 1974 discharge was responsible for the first fish kill. He also stated that a certain area of the Country Club Lake had a zero oxygen content which would have killed fish coming in contact with that area. Michael McIntosh, who holds a master's degree in biology and is employed by the Bureau of Pollution Control, testified as to water and fish samples collected between the Davis plant and Country Club Lake. McIntosh expressed that a concentration of PCP of even one part per billion is reason for concern. These samples, taken January 24, 1979, indicated that, at the discharge pipe of Davis, there was a concentration of 11,000 parts per billion of PCP. Fish samples (arriving at by dissolving fish tissue) indicated concentrations of 4,400 parts per billion and 17,000 parts per billion. A week later McIntosh collected samples from the Phillips' lake. Two of the water samples discussed in the witness's deposition contained concentrations of 20.5 parts per billion and 31 parts per billion.
Dr. George Pessoney, a biologist, testified concerning samples collected from Phillips' lake in 1980. Pessoney collected sediment, fish, bird and water samples. The sediment samples indicated 40 parts per billion PCP at the spillway of Country Club Lake; five parts per billion at the upper end of Phillips' lake; and one part per billion at the lower end of Phillips' lake. The muscle tissue of the fish taken from Phillips' lake contained 40 parts per billion PCP.
Dr. Richard Pierce, an oceanographer/chemist, qualified as an expert in toxic organic substances in water. He authored two studies on the effects of PCP on Country Club Lake. While Pierce did not study Phillips' lake, he did collect some samples there at the request of Phillips in 1981. At four separate sites, the sediment contained concentrations of 1,213 parts per billion; 137 parts per billion; 130 parts per billion; and 164 parts per billion PCP. Dr. Pierce stated that these high results indicated that the lake had been subjected to an influx of large concentrations of PCP. A dioxin test of the sediment was also conducted. The dioxins ranged from 4 parts per billion to 580 parts per billion. Pierce stated that although the PCP is degradable, it degrades into toxic substances  dioxins. PCP degrades in a few months, but the dioxins last seven years or longer. Pierce indicated that to clean Phillips' lake would entail removing 4-5 inches of the sediment under the water.
John Harper, with the Miss. Bureau of Pollution Control, indicated that if sediment containing dioxins were removed from Phillips' lake, it would have to be disposed of in Alabama.
Richard Simmons, a professional engineer, testified as to the estimated cost of repairing Phillips' lake, which included removal of 4-5 inches of the bottom soil of the lake and hauling the soil to Alabama, at a total of $2,545,386.00. Simmons estimated that this cost would be increased at a rate of 15% per year.
Witnesses for the defense testified concerning the "sub-lethal" nature of the concentrations of PCP and dioxins found in Country Club Lake and Phillips' lake. Dr. Pier, a toxicologist, discussed the terms "lethal concentration" and "lethal dose." *76 An "LC-50" means that exposure to a concentration of toxic chemical will kill approximately 50% of the organisms in the population. As applied to blue gill bream (fish) Dr. Pier testified that an LC-50 would be achieved by exposure for three hours of 3,000 parts per billion PCP. Dr. Pier also discussed the Pierce study. He determined that none of Dr. Pierce's figures exceeded the LC-50 volume as established by Dr. Pierce himself (150 PPb) nor did he consider the amounts of the PCP found in the sediment to be toxic. Basing his opinion on Dr. Pierce's studies, Dr. Pier believed there were no chronic or acutely toxic levels of PCP in the system; and that there were no accumulations that would in any way over a period of time cause toxic problems either in the aquatic life or to human beings swimming or eating the fish. Dr. Pier did determine that certain of the samples collected by Pearce near Davis were at toxic levels.
Mike Bonner, an analytical chemist, collected samples from Phillips' lake in 1981 and analyzed them for PCP content. Nine water samples were collected, ranging in concentrations from 1.89 parts per billion to 3.98 parts per billion PCP. He also collected three sediment samples from Phillips' lake. Judging by the Pierce lethal concentration at 300 parts per billion and sub-lethal concentration at 100 parts per billion, Bonner found no lethal levels in the sediment samples he collected. He stated that not every release of the chemical is harmful provided it is a low level release. He also admitted that the fish would accumulate PCP to a certain point and acquire lethal levels after long exposure to low levels of PCP.
Dennis Lindsey, a product manager at Vulcan Material Company (the PCP supplier for Davis) was qualified as an expert in the properties, characteristics and toxicity of PCP and the dioxins contained therein. Lindsey visited Phillips' lake in March of 1981 and took samples with Bonner. Lindsey stated that a finding of 40 parts per billion PCP in the fish tissue would not kill the fish, nor would it be harmful to anyone eating the fish. Lindsey also noted that none of the water samples approached the 100 parts per billion sub-lethal levels as cited by Dr. Pierce. However, Lindsey noted that the sediment samples taken from Phillips' lake contained 213 parts per billion, 137 parts per billion, 130 parts per billion, and 164 parts per billion of PCP. He stated that those concentrations would only affect fish if they were bottom feeders,[1] or if they ate organisms feeding from the bottom. Lindsey also stated that there should be no concern with the run-off water from the Davis yard as far as PCP concentrations were concerned.
Dr. Gary McGinnis, a Professor of analytical chemistry at Mississippi State University, qualified as an expert in chemical analysis and the effects of PCP on the environment. He received three water samples in March of 1981, and was asked by Lindsey to determine the PCP content. These samples ranged from 1.5 parts per billion to 2.5 parts per billion PCP. Dr. McGinnis also analyzed sediment samples for dioxin content. Dioxin content ranged from 0 to 38.4 parts per billion in the samples examined. Dr. McGinnis then discussed what effects these concentrations of dioxins would have. He stated that a human being would have to eat 14,000 pounds of dry mud a day to reach "normal levels" of dioxins in his system. He stated that the dioxin attached to PCP is the least toxic of the dioxin family. Dr. Lindsey also stated that the sediment found in Phillips' lake would not be considered toxic to fish or humans.
T.J. Culpepper, a Ph.D. in the field of chemistry, was qualified as an expert in analytical chemistry and chemical properties of PCP and other contaminants. He took water samples of rainwater runoff from Davis and other samples during the years 1977 through 1981. He found that *77 none of his water samples exceeded the limits as set by Dr. Pierce and found no dioxins in the soil samples collected by him. Dr. Culpepper discovered a small half drum vat on Phillips' property which smelled of PCP. [Phillips had used a penta solution to treat poles with which he constructed the foundations for his cabin on his property.] Dr. Culpepper also discussed the possible contamination of Phillips' lake through sewage entering the water. His tests were primarily on Country Club Lake, where he found sewage leakage entering the water, apparently from septic tanks in the area. He stated that the fecal matter sank to the bottom of the lake and consumed oxygen in the water. This problem was compounded when it rained, the rainwater dropping to the bottom of the lake, disturbing the sludge, and dispersing the low oxygen contents. Dr. Culpepper stated that this would be a possible cause of a fish kill when it rained, and that these dead fish from Country Club Lake could have entered Phillips' lake over the dam. Dr. Culpepper stated that there would be no harmful effects from the rainwater runoff from Davis to fish or humans. He also stated that PCP has a half-life of 12.8 days in an anaerobic setting and of 13.9 in an aerobic setting. During cross-examination, it was suggested that Dr. Culpepper's samples had been taken long enough after the PCP had entered the water that he would naturally have found lower readings due to the half-life effect. One sample taken immediately after a rain indicated the highest concentration of PCP in the water.
Phillips was then called to the stand by the defense as an adverse witness. For the first time the court learned that the Mississippi Game & Fish Commission conducted a rotenone poisoning to reduce an overpopulation of blue gills in the lake in August, 1977. To the Commission's surprise, the rotenone killed not only blue gills, but 15% to 16% of the other game fish. The Commission never admitted to using too much rotenone, but did, however, restock Phillips' lake.
In rebuttal, appellant suggested that the overkilling of the fish in Phillips' lake when the rotenone poison was administered was due to a "synergism" effect, wherein the fish already exposed to PCP were more vulnerable to the added poison than they should have been. During rebuttal, Dr. Pierce also stated that "sub-lethal" does not mean that the fish are unharmed. He stated that toxic effects were found at levels as low as 3.2 parts per billion. It was pointed out, however, that Dr. Pierce had studied Country Club Lake primarily. He collected samples from Phillips' lake only once.

Chancellor's Finding
The chancellor made a lengthy finding on the facts hereinbefore stated. With reference to PCP in Dr. Phillips' lake, the chancellor found:
7.
That the first known water samples regarding the lake of Tom Rhea Phillips were collected by various officials of the Bureau of Pollution Control in January of 1979. Analysis of the samples reflected the presence of PCP in low levels in the Complainant's lake. However, such analysis failed to detect levels of PCP in excess of the sub-lethal levels as defined by Complainant's expert or in an amount in excess of the water quality criteria for clean water established by the EPA and Mississippi Air and Water Pollution Commission.
8.
That continued on the spot inspections and investigations by the Bureau of Pollution Control since the January, 1979, incident, have failed to detect any amounts of PCP present in the Mineral Creek water course, and specifically the lake of Tom Rhea Phillips, which would warrant any type of official action. Any amounts of PCP detected in the water course since 1979 have been at sub-lethal levels as defined by the Complainant's expert or in amounts less than the established water quality criteria as promulgated *78 by the EPA and Mississippi Air and Water Pollution Commission.
* * * * * *
... Finally, Dr. Pierce had to admit that all of the samples collected and analyzed by Pierce and others reflected PCP levels lower than the sub-lethal level as defined by Pierce. In addition, many of his initial test results were not confirmed by more scientific analysis. Finally, in response to a question by the Court, Dr. Pierce indicated that probably all of the runoff problem from Davis could be solved by capping the site of the old waste water treatment pond with clay.
* * * * * *
The Court further FINDS that, after considering all the pleadings, oral and documentary testimony, exhibits offered at the trial, and all other documents filed in connection herewith, that the Complainant has not met the required burden of proof with respect to both liability and damages and his prayer for injunctive relief and that, accordingly, the original Bill of Complaint, as well as all Amendments thereto, should be dismissed with prejudice at the cost of the Complainant.
The substance of the chancellor's finding and judgment was that PCP had entered, invaded and polluted Phillips' lake from the Davis plant and operation, but that the levels of PCP were sub-lethal and did not result in damage to the aquatic wildlife and to human beings. Thus, the relief prayed for by appellant was denied.
Phillips contends the lower court found that there had been an invasion of his property (lake) by Davis and that his lake was polluted by the PCP from the Davis operation. Therefore, Phillips argues, he has proved his case under the doctrine of nuisance. We agree, and are of the opinion that a plaintiff may recover damage by a physical invasion of his property on a simple showing that the defendant was responsible for the physical invasion. City of Jackson v. Filtrol Corp., 624 F.2d 1384 (5th Cir.1980).
In Southland Co. v. Aaron, 221 Miss. 59, 72 So.2d 161 (1954), the Court said:
One of the cardinal rights of a riparian proprietor is to have the water of the stream come to him in its natural purity, or in the condition in which he has been in the habit of using it for the purposes of his domestic use of his business, and any wrongful pollution, defilement, or corruption of the water, which prevents its use for any of its reasonable or proper purposes, constitutes an actionable infringement of such right. It is the generally accepted doctrine that a riparian owner sustaining substantial injuries by reason of such an invasion of his rights may maintain an action without regard to the motive which prompts the invasion, and the pollution of a stream to the injury of a lower proprietor will not be justified by the importance of the business of the upper proprietor to either the public or the wrongdoer, or by the fact that the latter is conducting such business with care and in the only known practical mode.[2]
* * * * * *
Where negligence is not an element of a nuisance, the rules governing the sufficiency of complaints for negligence have no application in actions for nuisances. Thus, ordinarily, negligence need not be alleged or proved. Moreover, even though it is averred that the acts complained of have been done negligently, it does not make negligence a material question; and, if negligence is alleged, such averments may be disregarded as surplusage.
221 Miss. at 72, 74, 72 So.2d at 165, 166.
In City of Oxford v. Spears, 228 Miss. 433, 87 So.2d 914 (1956) suit was brought against the City for damages because of maintaining a nuisance by polluting a water course running through plaintiff's land in discharging raw sewage in the stream. There, the Court said:
The rule is well settled by the authorities generally that if, by reason of conduct *79 by the defendant in maintaining a nuisance by polluting a stream, the land is rendered unfit or less valuable for use as a pasture, or other purposes for which it is adapted with the stream running through it unpolluted, in the absence of other items of special damages, the measure of damages of the owner of the land is the diminution of the market value of the property if the injury is of a permanent nature, or the diminution in the rental or usable value if the injury is of a temporary nature. [Citations omitted].
In addition, the landowner is entitled to recover such special damages as he may be able to prove. These special or incidental damages are elements of damage separate, distinct, and independent of the depreciation of the value of the property or of the depreciation of the rental or usuable value of the property. Included in the category of special or incidental damages are annoyance, discomfort, inconvenience, and sickness. 66 C.J.S., Nuisances, § 175, p. 979. There may be others.
The proof did not establish permanent damage to appellee's land. It showed an abatable nuisance. Damages, therefore, should be limited to depreciation of the rental or usable value of the land for the six-year period ending with the filing of the suit, plus any special or incidental damages sustained and proven.
228 Miss. at 439-40, 87 So.2d at 916. See also Love Petroleum Co. v. Jones, 205 So.2d 274 (Miss. 1967); Town of Fulton v. Mize, 274 So.2d 129 (Miss. 1973); Magnolia Petroleum Co. v. Stinson, 230 Miss. 533, 93 So.2d 815 (1957).
In Shattles v. Field, Brackett & Pitts, Inc., 261 So.2d 795 (Miss. 1972), the Court said:
The general rule is that a landowner is entitled to an injunction directing the removal of a trespassing structure on his land erected thereon by the owner of adjoining land. The facts that the aggrieved owner suffers little or no damage from the trespass, that the wrongdoer acted in good faith and would be put to disproportionate expense by the removal of the trespassing structures, and that neighborly conduct as well as business judgment would require acceptance of compensation in money for the land appropriated, are ordinarily no reasons for denying an injunction. Rights in real property cannot ordinarily be taken from the owner at valuation, except under the power of eminent domain. Only when there is some estoppel or laches on the part of the plaintiff, or a refusal on his part to consent to acts necessary to the removal or abatement which he demands, will an injunction ordinarily be refused. Turner v. Morris, 196 Miss. 297, 17 So.2d 205 (1944).
261 So.2d at 797-798.
We are of the opinion the lower court in the case sub judice may not be held manifestly wrong in its finding of fact that there were sub-lethal levels of PCP produced into Phillips' lake and that the proof was not sufficient to require a restoration of the lake and its previous unpolluted state. Its finding in that respect is affirmed.
However, we are of the opinion that Phillips has established an invasion of his property and a nuisance created by Davis. The measure of damages was discussed in City of Oxford v. Spears, supra, and other cases cited. Phillips is entitled to damages on whatever the proper proof may indicate. The evidence shows that, at the time of the trial, Davis had eliminated its waste holding pond, and had installed a self-contained waste plant. Even so, Dr. Phillips is entitled to an injunction enjoining and prohibiting further PCP pollution into his lake by Davis.
The judgment of the lower court will be affirmed as indicated herein; it will be reversed and rendered and an injunction will be granted enjoining further pollution of the Phillips lake; and will be reversed and remanded for the assessment of damages, consistent with this opinion.
*80 AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.
PATTERSON, C.J., WALKER, P.J., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON, and ANDERSON, JJ., concur.
SULLIVAN, J., not participating.
NOTES
[1] Along with other species of fish, blue gill bream and catfish, common to such lakes, are bottom feeders.
[2] Phillips built his lake and camp approximately ten (10) years before Davis built its plant.