F. O. GREY, Appellant,

v.

HAYES–SAMMONS CHEMICAL CO.,
Appellee.

No. 19133.

United States Court of Appeals
Fifth Circuit.

Nov. 7, 1962.

Walter R. Bridgforth, Bridgforth &
Love, Yazoo City, Miss., for appellant.

W. F. Goodman, Jr., Jackson, Miss.,
J. D. Thames, Vicksburg, Miss., Eliza-
beth W. Grayson, Jackson, Miss. (Voller

& Thames, Vicksburg, Miss., Watkins & Eager, Jackson, Miss., of counsel), for appellee.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This is a products liability case. The culprit is a growth hormone, 2–4D or 2–4–5T, a weed killer, minute quantities of which kill cotton.

Mississippi law controls the substantive issues.

F. O. Grey, a cotton grower in Yazoo County, Mississippi, filed suit in the state court against the Hayes-Sammons Chemical Company, a Texas manufacturer of insecticides, for $11,423.75 for damage to his 1957 crop allegedly caused by a harmful herbicide contained in a sealed can of insecticide purchased from Hayes-Sammons through a distributor, T. A. Quinn Chemical & Fertilizer Company. Hayes-Sammons removed the suit to the federal court. The plaintiff predicates his claim on (1) breach of warranty, (2) negligence, and (3) an agreement to settle. The defendant contends (1) that there can be no recovery on breach of warranty because there was a lack of privity; (2) that the plaintiff failed to allege negligence in the complaint and failed to try the case on the theory of negligence; (3) that there was no agreement to settle. The district judge withheld from the jury the question whether the parties had entered into a settlement agreement, on the grounds that the evidence failed to show consideration and the alleged agreement was too indefinite to be a valid contract. He did not expressly instruct the jury on negligence [1] and refused to instruct on *res ipsa loquitur*. The court gave instructions on the implied warranties of fitness and merchantability [2] without referring to privity.[3] It is fair to say that the jury had to decide only one issue: causation. In his charge to the jury the district judge summed up the case: "Now the case, of course, nar-

---

1. Unless it can be said the following instructions necessarily relate to negligence: "It must be based upon evidence showing with a reasonable degree of certainty that the plaintiff was damaged as a proximate result of a wrong of the defendant; and if the defendant permitted some type of poisonous hormone to get into this insecticide poison, then that would be a wrong and the plaintiff would be entitled to recovery * * *. If you should find that the 2–4D or 2–4–5T or other hormone was not placed in the can by the defendant nor permitted to get into the cans by the defendant, then your verdict would be for the defendant * * *. But if the defendant permitted these harmful hormones to get into a can, then it would be responsible, if the plaintiff proved that to be a fact; * * * the question for you to determine is whether or not the defendant caused it, and that resolves further into the question of whether or not the defendant permitted the hormones to get in the cans." R. pp. 240–244.

2. "I[f] you should find from the evidence that they were not fit and suitable when sold and when applied in accordance with the directions, and that they were contaminated with a dangerous impurity that was harmful to the cotton and at a time when the insecticides were purchased by the plaintiff, and if you should further believe that as a proximate result thereof the plaintiff's cotton crop was damaged, then you would find a verdict for the plaintiff. But before the plaintiff could recover, it is necessary that he show that he followed the directions in its application and that these hormones were contained in some portion or in some can that he purchased.

"Now, there is another implied warranty by the law as to the merchantability of a product, and that is this: If you should believe from a preponderance of the evidence that the poisons manufactured by the defendant or a part thereof were contaminated when purchased by the plaintiff by a hormone or harmful impurity which made it unsaleable for the purpose of application to growing cotton to prevent insect damage, and further believe that the plaintiff was damaged thereby, you would then find for the plaintiff." R. 245–246.

3. Unless the instruction that "Quinn was not an agent, nor by virtue of his commission sales was he permitted to bind the defendant" amounted to a charge that there was no privity of contract between Grey and Hayes-Sammons.

rows down to the proposition, 'Where did the poison come from that damaged this crop?'" The jury decided that it came from the defendant and returned a verdict for the plaintiff in the amount of $8,750. On the defendant's motion, the district court granted judgment for the defendant notwithstanding the verdict. The court ruled, first, that a disclaimer or non-warranty clause on the insecticide cans relieved Hayes-Sammons of any liability: "It follows from that warning to the plaintiff that he assumed all risks, and under the law of Mississippi this is a valid provision." Second, although the court did not in terms refer to privity, it held that in Mississippi, except for food products, no warranty runs from a manufacturer to a consumer. We reverse and render.

## I.

### The Facts

The case requires careful consideration of the facts, especially as they bear on the issues of privity and causation.

In 1957 Grey rented and farmed two tracts of land in Yazoo County. He planted 45.6 acres of cotton on one tract, the "Potato Hill Place", and 19 acres on the other, the "16th Section". The two cleared fields are separated by a wooded area about three-quarters of a mile wide. There was plenty of moisture that summer, the land was well fertilized, and by the end of July the crop was beginning to fruit heavily. Grey expected a good yield, about a bale and a half an acre or better.

Toward the end of June, Grey began spraying his cotton every five days using only "Mission Brand Chemicals" insecticides manufactured by Hayes-Sammons and purchased from Quinn at the Satartia warehouse. The insecticide was packaged in uniform, sealed five gallon cans. The invoices listed the insect poisons as Dynatox, Malathion (Mala-Tox), Methyl Parathion, DDT, and Endrin. Except for one occasion when the spraying was done by an airplane, Grey

did his own spraying, using a tractor mounted with a fifty-five gallon metal drum or barrel and spraying equipment that would cover four rows of cotton at a sweep. Beginning at the Potato Hill Place, he followed a regular pattern through the cotton fields so that the cotton would be trained to let the tractor through. In mixing the spray he used a gallon jug for measuring the insecticide. He poured the gallon of insecticide into the drum and then filled the drum with water from Potato Hill Bayou. The bayou is a running stream. Later investigation showed that it was free from any dead or distorted vegetation. One drumload of spray was enough to cover twenty-five acres. The first load would therefore spray a little more than half of the 45.6 acre tract. The second load would finish that planting and also spray the North Quarter of the 19-acre tract in the 16th Section. A third part-load would finish the job. Grey never had any 2–4D or 2–4–5T or any other growth hormone herbicide or weed killer.

About July 25 the cotton blooms were turning black, drying up, hanging on the stalks. The squares began to turn red and burst open. New leaves grew in distorted patterns. The damage was uniform throughout the 45.6 acre tract and the North Quarter of the 19-acre tract; the remainder of the 19-acre tract was only slightly damaged. Grey notified John Book, an employee of Quinn's in charge of the Satartia Warehouse. Book notified another Quinn employee who reported the matter to Andrew White, manager of the Dixie Division of Hayes-Sammons. White was in charge of all Hayes-Sammons operations outside of the state of Texas. He and one of the defendant's entomologists examined the plaintiff's crop. They agreed that the damage resulted from some type of growth hormone herbicide, such as 2–4D or 2–4–5T. They inspected Potato Hill Bayou and found no evidence of contamination there. They noted that there was no damage to growth surrounding the cotton fields, an indication that the

herbicide did not fall on the cotton from the air.[4]

In response to White's request that Grey cooperate in an investigation to determine the cause of the damage, Grey gave White eighteen five-gallon cans which had contained the insecticide. White sent these to two laboratories for examination. The laboratories informed him that there was no acceptable test for determining whether the cans had contained a herbicide. Grey testified that White agreed to pay for the loss if he would cooperate with the investigation and not tell other people about the damage. White testified that he agreed to pay for the loss only if it were found that the company's insecticide had caused the damage. White acknowledged that he did ask Grey to keep the matter quiet, since the insecticide business is "seasonal and very subject to misinformation and scare-type of programs." Grey said that they did not discuss the amount of damage and that he did not then know how great his loss was or how much Hayes would pay him. Book, Quinn's employee, testified: "Mr. White told Mr. Grey that he wanted him to keep this under his hat. * * * And I agreed with him on that part because I was selling their product there. * * * He said there would be an adjustment made on the cotton crop."

Grey testified that he assembled his spraying equipment himself, and that he and his brother took turns using it. His brother farmed a tract of land about a mile away. When his brother was not using the spray equipment it was kept at Grey's house. Grey said he did not know what kind of poison his brother was using. When asked, "You don't know if he used any weed killer or not?" Grey answered, "I'm sure he did."

Several witnesses testified that cotton is highly susceptible to a growth hormone herbicide. One stated that damage would result from an application of as little as twenty-four ten-thousandths of a pound per acre. White said that even a tiny dosage was dangerous; for example, there was widespread damage to cotton crops in 1947 and 1948 when 2–4D was first sold and used cans were reused for packaging insecticides.

White testified that Hayes-Sammon's original plant is in Texas and that during 1957 a second plant was opened at Indianola, Mississippi. Operations at both plants are nearly identical. The principal equipment is a large tank used for mixing batches of insecticides. Each batch of insecticide contains 165 gallons and is used to fill either five fifty-three gallon cans or fifty-three five gallon cans. The plants use only new cans for packaging the products. The cans are sealed almost immediately after being filled. The same equipment is used to mix different types of insecticides but no herbicides are mixed. The company sells certain growth hormone herbicides, including 2–4D, but it purchases these already packaged and labeled under another brand, and it is careful to keep these in a separate warehouse at the Texas plant and to store the empty cans in a part of the building separate from the liquid mixing area. White stated that if 2–4D were placed in a tank it would not be possible to wash it out. He said also that Hayes-Sammons received no other complaints during 1957 that crop damage had been caused by use of its insecticides.

## II.

### The Requirement of Privity under Mississippi Law

A. Courts and commentators have exposed the historical error in making privity an essential element of warranty on the theory that warranty is contractual in concept.[5] "The action for breach of

---

4. The plane was used July 15–18. It did not spray the 19-acre field. The pilot sprayed certain fields of cotton immediately before he sprayed Grey's 45.6-acre field. The defendant's investigation disclosed no damage to the other crops and no evidence of any contamination by the plane.

5. Bohlen, The Basis of Affirmative Obligation in the Law of Torts, 1905, 44 Am.L. Reg.,N.S.; 1 Williston, Sales § 195 (1948); Prosser, Torts, § 84 (1955).

warranty was originally one on the case, sounding in tort and closely allied to deceit, from which it was not distinguished".[6] However, the close association of "warranties" with contracts and sales has been of such long standing that many courts which no longer require privity, when recovery is based on negligence, still require privity when recovery is based on warranty. "In products liability cases *based upon the theory of breach of warranty*, the Mississippi courts require privity, except where the injury-causing product is a food product." 1 Hursch, American Law of Products Liability § 6:91, p. 713 (1961). Thus, in Royal Feed & Milling Co. v. Thorn, 1926, 142 Miss. 92, 107 So. 282, the Mississippi Supreme Court said, "It is settled law in this state that, where a person warrants the soundness of his products to a dealer under the express warranty, it does not extend to the purchasers from such dealer." The rationale is: "[T]here is no contractual relation existing between the original seller, the warrantor, and a subpurchaser. They are unknown to each other in the transaction." Pease & Dwyer Co. v. Somers Planting Co., 1922, 130 Miss. 147, 93 So. 673.

B. Thirty years ago there was no uncertainty in Mississippi law on the requirement of privity in products liability cases *based on negligence*. Today, we must make an Erie, educated guess as to the law. One authority writes:

"The privity requirement continues to obtain in negligence cases, but the decisions in that jurisdiction recognize the inherently and imminently dangerous product exceptions to the requirement, together with the unwholesome food and drugs exceptions thereto extending this exception to injury-causing tobacco prod-ucts." 1 Hursch, American Law of Products Liability § 6:91, p. 713 (1961).

But the exception in favor of "inherently and immediately dangerous" products has now just about swallowed the general rule. In the landmark case of MacPherson v. Buick Motor Co., 1916, 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696, the product was an automobile; the court, however, extended the exception to include anything that would be dangerous if negligently made. Judge Cardozo, speaking for the New York court, said: "If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully."

In 1928 in Ford Motor Co. v. Myers, 1928, 151 Miss. 73, 117 So. 362 the Mississippi Supreme Court referred specifically to MacPherson v. Buick Motor Co. and to similar decisions holding that a manufacturer "owes the public a duty, irrespective of any contractual relation, to use reasonable care in the manufacture" of appliances. The court refused to follow MacPherson v. Buick Motor Co., because the Mississippi "court has held to the contrary."

At the time Ford Motor Co. v. Myers was decided, although there was a strong trend in the direction pointed by MacPherson v. Buick Motor Co., there were still a number of states which adhered to the requirement of privity in negligence actions. Today that decision "is all but universal law in the United States", and the doctrine extends to damage to property as well as to injury to person.[7] In 1946 the Supreme Judicial Court of Massachusetts, a court reluctant to give up the requirement of privity,

---

For recent discussions see Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer) 69 Yale L.J. 1099 (1960); Patterson, Manufacturer's Strict Warranty: Tort or Contract? 10 Mercer L.Rev. 272 (1959). James, Green, Plant, Lucey, Noel, Strict Liability of

Manufacturers: A Symposium, 24 Tenn. L.Rev. 923 (1957).

6. Prosser, Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1126 (1960).

7. Prosser, Torts § 84, p. 500 (1955).

said: "The time has come for us to recognize that that asserted general rule [requiring privity] no longer exists." Carter v. Yardley & Co., 1946, 319 Mass. 92, 64 N.E.2d 693, 164 A.L.R. 559. The authors of a leading casebook on torts state flatly that the MacPherson doctrine "is now accepted in all of the American courts".[8]

In 1954 in E. I. Du Pont De Nemours & Co. v. Ladner, 221 Miss. 378, 73 So.2d 249, 254, the Mississippi Supreme Court went out of its way to show its approval of the MacPherson doctrine. That was an action for damage to the plaintiff's cattle as a result of feeding soybean meal processed with a chemical compound manufactured by the defendant. The court pretermitted the question of privity and decided the case in favor of the manufacturer on the ground of lack of causation. Nevertheless, the court said:

"Whatever the rule may have been originally, the principle seems now to be well established by the decisions of many courts that a person who has had no direct contractual relations with a manufacturer may nevertheless recover from such manufacturer for damages to property caused by the negligence of the manufacturer in the same manner that such a remote vendee or other third person can recover for personal injuries. 'The modern doctrine may be regarded as allowing recovery for injury or damage to property in all instances where a case in tort law of negligence can be made out against the manufacturer—that is, where the requisite elements of foreseeability and breach of duty are established, where the manufacturer can be found to have been negligent, and such negligence was the proximate cause of the property damage.' Annotation 164 A.L.R. 593. See El-

lis v. Lindmark, 1929, 177 Minn. 390, 225 N.W. 395; Hunter v. Allied Mills, 1937, 184 S.C. 330, 192 S.E. 356; Ebers v. General Chemical Co., 1945, 310 Mich. 261, 17 N.W. 2d 176; E. I. Du Pont de Nemours & Co. v. Baridon, 8 Cir., 1934, 73 F. 2d 26."

The First Circuit relied on this dictum in Mason v. American Emery Wheel Works, 1 Cir., 1957, 241 F.2d 906. In that case the district court concluded "reluctantly" that it was bound by the Mississippi "harsh rule" as declared in Ford Motor Co. v. Myers, "contrary to the great weight of authority". The First Circuit reversed the district court:

"MacPherson v. Buick Motor Co., supra, started a new trend in this particular field of the law, and its substantive result has found favor in § 395 of the American Law Institute Restatement of Torts. If the Supreme Court of Mississippi had recently reconsidered the rule it applied in Ford Motor Co. v. Myers, supra, and had decided to adhere to it on the ground of stare decisis, no doubt the federal courts would have had to accept the local law as so declared. But it would be gratuitous and unwarranted to assume that the Supreme Court of Mississippi would now so hold, when we bear in mind the readiness of other courts, in conservative jurisdictions at that, to overrule their earlier holdings and to bring their jurisprudence into accord with what is now the overwhelming weight of authority. See, for instance, Carter v. Yardley & Co., 1946, 319 Mass. 92, 64 N.E.2d 693, 164 A.L.R. 559."

It is, of course, unusual for a federal court to base an Erie decision on pure dicta in preference to a firm holding to the contrary.[9] But we agree with

8. Smith and Prosser, cases on Torts 854 (1952).

9. The importance of E. I. du Pont de Nemours & Co. v. Ladner as reflecting a change of attitude of the Mississippi Supreme Court has been recognized

by all of the writers who have considered the case. "The further and more important inference is that the court intends to allow suit against remote manufacturers in a much more liberal manner than before." Note, 28 Miss.L.J. 250,

the First Circuit.[10] We must decide the case as if we were sitting as a Mississippi court. The court's strong language in E. I. du Pont de Nemours & Co. v. Ladner, the reference to recent authorities, and the court's consciousness of the fact that its discussion of the "modern doctrine" was not necessary to the decision, compel us to say that the Missssippi Supreme Court was putting litigants on notice that it no longer considered Ford Motor Co. v. Myers to be the law of Mississippi.

Stribling Bros. Machinery Co. v. Girod Co., 1960, 239 Miss. 488, 124 So.2d 289; Watts et al. v. Adair, 1951, 211 Miss. 777, 52 So.2d 649, and similar cases are not in conflict with this conclusion. In each of those cases the party sued was not the manufacturer. Different principles are involved when the defendant is not the maker of the product. The maker controls the manufacturing and packaging processes and is primarily responsible for representations in advertising and labeling his product.

■ Under Mississippi law, as we read E. I. du Pont de Nemours & Co. v. Ladner and as the First Circuit held, privity is not required when the action is against the manufacturer for breach of his duty of due care.

252 (1957). "The few courts which still hesitate to recognize the MacPherson doctrine explicitly, are apt to indicate by dicta that they are about ready to do so. So in E. I. du Pont de Nemours & Co. v. Ladner the Mississippi court referred with approval to the 'decisions of many states' abolishing the privity requirement and extending liability to remote purchasers to property damage." Noel, Manufacturers of Products—The Drift Toward Strict Liability, 24 Tenn.L.Rev. 963, 965 (1957). See also Prosser, Assault on the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1098, 1100 (1960); 1 Frumer & Friedman, Products Liability, § 5.03 [1], n. 17 (1961).

10. Judge Magruder, speaking for a unanimous court in Mason v. American Emery Wheel Works, 1957, 241 F.2d 906, 909, said:

## III.

### The Claim on the Theory of Negligence

■ Contrary to the defendant's contention, we find that the plaintiff did seek recovery on the theory of negligence.

The complaint alleges that: "At the time said agricultural poisons and insecticides were packaged and sealed by the defendant, said agricultural poisons and insecticides had become so contaminated or so unbalanced in its contents, as to a container thereof, that the contents of such container became utterly destructive of growing cotton crops and poisonous when applied upon growing cotton crops, before plaintiff Grey applied same to his growing cotton crops as hereinabove stated." The plaintiff's opening statement sets forth plainly that he expected to show that the defendant was negligent:

"We will submit and urge to you that these poisons came to Mr. Grey with a warranty of a merchantable quality and that no poison could be sold in commerce that was so contaminated as was a portion of this poison; *and, further, that any poison so concocted or so packaged, was packaged, must have been packaged, in a negligent manner.*"

"Of course it is not necessary that a case be explicitly overruled in order to lose its persuasive force as an indication of what the law is. A decision may become so overloaded with illogical exceptions that by erosion of time it may lose its persuasive or binding force even in the inferior courts of the same jurisdiction. And where, as in Ford Motor Co. v. Myers, the Supreme Court of Mississippi, twenty or thirty years ago, applied an old rule which has since been generally discredited elsewhere, it is relevant to consider what the Supreme Court of Mississippi has subsequently said on the point. See 'Note on the Ways of Ascertaining State Law,' Hart & Wechsler, The Federal Courts and the Federal System 628–30 (1953)."

The defendant met the issue by evidence that there was no negligence in the manufacture and packaging of the insecticide. Finally, the plaintiff requested that the court instruct the jury on the *res ipsa loquitur* doctrine, making it evident that he persisted in his claim that the defendant was negligent.[11]

Subject to the plaintiff's carrying the burden of proving negligence and subject to the plaintiff's laying the proper predicate, the doctrine of *res ipsa loquitur* is no less applicable to damage from sealed cans of insecticide (which could not be tampered with) as it is to injury from Coca-Cola bottles. See Johnson v. Coca-Cola Bottling Co., 1960, 239 Miss. 759, 125 So.2d 537; Palmer v. Clarksdale Hospital, 1949, 206 Miss. 680, 40 So.2d 582. "The doctrine is more likely to be applied in a situation where a product packed in a sealed container contains some foreign substance." Noel, Manufacturers of Products—The Drift Toward Strict Liability, 24 Tenn.L.Rev. 963, 977 (1957). No Mississippi cases have applied *res ipsa loquitur* to crop damaged by contaminated insecticides. However, in Burr v. Sherwin Williams Co., 1954, 42 Cal.2d 682, 268 P.2d 1041 the court said:

"The evidence is clearly sufficient to satisfy the requirement of the doctrine of res ipsa loquitur that the accident must be of such a nature that it probably was the result of negligence by someone, since it may be assumed that an insecticide such as the product involved here, which is designed for use on plants, will not ordinarily damage cotton crops if it is properly manufactured and applied. The evidence also meets the requirement that it must appear that the defendant is probably the one who is responsible. The fact that an accident occurs after the defendant relinquishes control of the instrumentality which causes the accident does not preclude application of the doctrine provided there is evidence that the instrumentality had not been improperly handled or its condition otherwise changed after control was relinquished by the defendant. Zentz v. Coca Cola Bottling Co., 39 Cal.2d 436, 444, 247 P. 2d 344. In the present case the co-defendants are the only persons likely to have been responsible for any alteration of the insecticide after the sealed drums were delivered by Sher-

---

11. The plaintiff requested the court to charge as follows: "The court instructs the jury for the plaintiff that although the burden rests upon the plaintiff to prove by a preponderance of the evidence that the defendant was guilty of negligence, which was the sole and proximate cause of the damage, if any, which the plaintiff sustained, and that this burden never shifts to the defendant, yet if you believe from a preponderance of the evidence that the poison which the plaintiff bought was manufactured, packaged and delivered by the defendant for use in poisoning growing cotton to prevent insect damage, and that the plaintiff received the containers in which said poison was placed by the defendant intact with seal unbroken, and that the plaintiff opened the containers before the poison was applied to the cotton, the containers when opened, being then sealed as he originally secured same, that he mixed the poison with water as directed and mixed and applied said poison in accord-

ance with directions given by the defendant and in the approved manner for the application of such poison, and that as a result of said application his cotton was damaged, and that, if you further believe from a preponderance of the evidence, that said damage does not occur in the ordinary course of things if the manufacturer uses reasonable care and caution in the manufacture, packaging and delivery of such poison, then the situation, if and when so found by you, affords reasonable evidence, in the absence of explanation, that the damage to the plaintiff's cotton crop was the result of the want of due care on the part of the defendant in its manufacture, packaging or delivery and you should find for the plaintiff and assess his damages in the amount you find, from the preponderance of the evidence, his crop was damaged by the application of the poison." (See Peerless Supply Co. v. Jeter, 218 Miss. 61, 65 So.2d 240, and cases there cited.) 65 So.2d pp. 250, 251.

win Williams to the cooperative, and these defendants gave explanations of their activities which would indicate that they had not mishandled or improperly changed the condition of the spray which damaged plaintiffs' crop. Moreover, as we have seen, there is evidence that unopened drums of the insecticide in the warehouse of the cooperative also contained sufficient 2, 4–D to injure cotton plants. Under all the circumstances the evidence warrants the conclusion that the damage to the crop was probably due to some negligent conduct on the part of Sherwin Williams in allowing its product to become contaminated or in failing to discover the contamination before it relinquished control of the product. The trial court, therefore, was justified in giving instructions on the doctrine."

On proper instructions from the court and subject to the limitations laid down by Mississippi courts, the plaintiff should have had the benefit of *res ipsa doctrine* in this products liability case.[12]

## IV.

### Submission of the Issue of Privity to the Jury

 In submitting the case to the jury the district judge charged that the manufacturer's products carried "an implied warranty that the poisons are fit and suitable for the use for which they are sold" and another "implied warranty of merchantability", that is, that the cans were not "contaminated and [had not] contained one of those harmful hormones". The defendant excepted to the charge, "it being the defendant's posi-

tion that there was no privity of contract between the parties and accordingly no warranty". In his letter opinion explaining the judgment NOV the district judge, after first resting his decision on the disclaimer, ruled that there "was no warranty of any kind that was applicable to the spray that was sold"; he did not discuss privity, as such. The plaintiff contends, on the warranty claim, that Quinn must be considered not as an independent contractor or dealer, but as the defendant's agent or factor del credere, thus preserving privity between Grey and Hayes-Sammons.

Quinn received a commission of 7½% on sales of the defendant's products made in his territory and also a salary of $300 a month, an arrangement common for sales agents but unusual for independent dealers. This arrangement was continued after he incorporated his business. Quinn sold insecticides manufactured only by Hayes-Sammons. Although Quinn handled other lines, only Hayes-Sammons products were kept in the Satartia warehouse; Quinn sold these directly to the farmers in the area. Under a written "Consignment Agreement," Quinn agreed to accept whatever insecticides Hayes-Sammons shipped to it. The defendant retained ownership of insecticide shipped to Quinn, although Quinn accepted the risks of loss or damage other than fire for insecticides in its possession. Quinn was obligated to keep Hayes-Sammons insecticides segregated from other goods in its warehouses. Quinn was entitled to withdraw insecticides from the Hayes-Sammons supply as it made sales. Each month Quinn was required to report withdrawals to Hayes-Sammons and to pay for the insecticides withdrawn. Hayes-Sammons controlled the prices of the insecticides, fixed the

---

12. "It is true that [the plaintiff] has the burden of proof on the issue of negligence. It is true also that he seldom, if ever, has any direct evidence of what went on in the defendant's plant. But in every jurisdiction, he is aided by the doctrine of res ipsa loquitur, or by its practical equivalent. In all jurisdictions

this at least gives rise to a permissible inference of the defendant's negligence, which gets the case to the jury * * *. [n.] The cases are legion." Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099, 1114 (1960).

territory for sales by Quinn, and paid certain advertising expenses. The transaction between Quinn and Grey was made in Quinn's name and without any reference to Hayes-Sammons, but that of course would not distinguish this case from innumerable cases of an undisclosed agency.

If Quinn extended credit to its customers, it did so at its own risk and became obligated to pay Hayes-Sammons for the goods sold whether or not it collected the account receivable. It is also significant that Quinn leased its warehouse and paid its own expenses. On the other hand, these are facts which show a mutual undertaking by Quinn and Hayes-Sammons to distribute the latter's products. The consignment basis on which Hayes-Sammons shipped its insecticides to Grey is itself inconsistent with the defendant's assertions that it sold the goods to Quinn who later in a separate transaction sold them to Grey. The parties carefully agreed that Quinn would keep the goods separate and that Hayes's ownership would continue until the instant the goods were removed from its stock for delivery to a customer. The insecticides were marked as belonging to Hayes-Sammons, and company officials were entitled to access to them. Quinn was not obliged to pay Hayes-Sammons for the insecticide until it withdrew and sold it. This effected an extension of credit that lent financial support to Quinn. Ordinarily it would mean that Quinn was selling goods which belonged not to it, but to the manufacturer.

The cases cited in the defendant's brief to support its argument that Quinn was not Hayes's agent are not very helpful. Most of these do not involve privity at all. Rather, cases such as Shell Petroleum Corp. v. Linham, 163 So. 839 (Miss. 1935) and Crescent Baking Co. v. Denton, 147 Miss. 639, 112 So. 21 (1927) are concerned with the existence vel non of a master-servant relationship essential in order to hold an employer liable for a tort committed by his servant. The Mississippi case which comes closest in point

to our present situation is Anticich v. Motor Car Inn Garage, 124 Miss. 822, 87 So. 279 (1921). In that case the purchaser of an automobile sued the regional distributor for breach of warranty, on the ground that the car was second-hand. The contract between the defendant and the dealer from whom the plaintiff had bought the car provided that the dealer would have the exclusive right to sell cars in a certain area; that he would display a sign advertising his dealership in Roamer cars and not sell any other make of automobile; that he was to sell at a price fixed by the defendant and receive a fifteen per cent discount upon all cars; and that title was to remain in the defendant until the dealer paid for the cars which he sold. Although the contract stipulated that "the dealer hereby agrees to buy * * * and the company agrees to sell to the dealer" a specified number of cars and although the word "agent" or "representative" was nowhere used, the Mississippi Supreme Court held that the dealer was a selling agent with authority to bind his principal in warranting that the car was new.

In the light of Anticich and considering all of the circumstances, we hold that Quinn acted sufficiently in the capacity of an agent to satisfy the requirement of privity on the claim for breach of warranty.

## V.

### Disclaimer

■■ Mississippi recognizes the validity of a non-warranty clause. Stribling Bros. Machinery Co. v. Girod Co., 1960, 239 Miss. 488, 124 So.2d 289; Industrial Finance Corp. v. Wheat, 1926, 142 Miss. 536, 107 So. 382. However, the disclaimer must clearly and unequivocally describe the warranties it disclaims, and uncertainties in the language used must be resolved against the disclaimer. Otherwise the seller would have an unfair advantage from his tactically superior position of being able to print any notice he wishes on his containers. See 1

Fruman and Friedman, Products Liability § 16.04[2] [e] (1961); Prosser, Warranty of Merchantable Quality, 27 Minn. L.Rev. 117, 160 (1942).

In this case the printed label on each can followed a more or less uniform style. The name of the insecticide, MALA-TOX, for example, was in two-inch letters; under the name was the further identification, "Malathion 5 lbs. Water Emulsifiable"; then came the list of ingredients:

"ACTIVE INGREDIENTS:

| | |
|---|---|
| Malathion (O, O-Dimethyl-Dithiophosphate of Diethyl-mercaptosuccinate) ...... | 57.00% |
| Related Compounds ........ | 2.88% |
| Xylene Range Aromatic Hydrocarbon Solvent ...... | 35.12% |
| INERT INGREDIENTS: ... | 5.00% |

Total ..... 100.00%"

Next there was a "Warning" against certain uses, such as swallowing or breathing the insecticide. The "General Directions" for its use *specifically referred to control of "cotton insects"*. Finally, on each label there was this non-warranty clause:

"Seller makes no warranty of any kind, express or implied, concerning the use of this product. BUYER assumes all risk for use or handling whether in accordance with directions or not."

Reading the disclaimer clause only and construing it strictly, the clause applies only to the use or handling of the product, that is, the manner by which the product is applied or employed. It has no application to implied warranties. It does not contemplate the effect of a foreign ingredient.

Reading the label as a whole, the disclaimer merely warns against hazards inherent in the use of an insecticide containing the listed ingredients and puts the buyer to assumption of risk for such hazards. The disclaimer clause is directed to the product made up of the ingredients described on the label. There is nothing to put a user on notice of a harmful, foreign substance capable of destroying the merchantability and the fitness of the product for the use for which it was advertised and sold.

Any other conclusion would place the public at the mercy of the manufacturer: with impunity he could fill his cans with sand or sawdust, pure herbicide or straight insecticide. Both the disclaimer and the description of the ingredients must be given effect. The disclaimer must not be read as erasing the representation as to the ingredients or as allowing an additional ingredient—"x", a foreign substance making the product dangerous for the purpose of a cotton spray.

There is no Mississippi decision directly in point. There are two decisions from other jurisdictions which support our conclusions, Burr v. Sherwin Williams Co., 1954, 42 Cal.2d 682, 268 P.2d 1041 and Diamond Alkali Co. v. Godwin, 1959, 100 Ga.App. 799, 112 S.E.2d 365. In Burr v. Sherwin Williams Co. the label on a drum of insecticide gave mixing directions and recommendations for use on various products, such as potatoes, seed alfalfa and clover, onions, and other truck crops. *It did not refer to cotton plants*. The label described the ingredients as they are described on the Hayes-Sammons label. After giving certain cautionary instructions the label concluded with a disclaimer identical with the Hayes-Sammons disclaimer. The court construed the clause strictly against the defendant. The disclaimer was effective to exclude an implied warranty of fitness for a particular purpose, but only because (unlike the Hayes-Sammons label) "nowhere does the label state that the product was suitable for cotton plants". The court held that the disclaimer was ineffective as to warranty of merchantabil-

ity.[13] Diamond Alkali Co. v. Godwin was an action by a remote purchaser for property damage to cabbage caused by using the defendant's insecticide. The label was similar in all important respects to the defendant's label in the instant case. The language of the disclaimer was identical with the language of the Hayes-Sammons disclaimer. The court held that the plaintiff's action for *property damage* was not barred, because the non-warranty "did no more than negate the defendant's liability for *personal injuries* during operation of applying the insecticide." (Emphasis supplied.) The court said:

> "We recognize that a seller may, with the consent of the buyer, disclaim any warranty of the article sold [citations omitted] and where such disclaimer of warranty is expressed on a label on an article purchased, it is a question for the jury to determine as to whether the buyer is aware of the disclaimer of warranty and received the article with knowledge of such disclaimer; however, what is held in the instant case is that there is not a disclaimer on the label of the can which limited the implied warranties that arose under the provisions of Code (Ann.) § 96–307. The label merely contained a warning that there is a physical hazard to a person involved in applying the insecticide."

We hold that the district court erred in ruling that the disclaimer barred recovery.

## VI.

### Causation

Hayes-Sammons contends that regardless of the question of warranty, Grey failed to sustain the burden of proof that the insecticide caused the injury to the cotton. In cases such as the one before us the proof must be by circumstantial evidence and inference; the plaintiff almost never has any direct proof what occurred in the manufacturer's plant. Magnolia Petroleum Co. v. Stinson, 1957, 230 Miss. 533, 93 So.2d 815; Farish v. Canton Flying Services, 1952, 214 Miss. 370, 58 So.2d 915; Johnston v. Canton Flying Services, 1950, 209 Miss. 226, 46 So.2d 533; Kurn v. Fondren, 1940, 189 Miss. 739, 198 So. 727. There is evidence that Hayes-Sammons and Quinn handled the insecticide carefully. But there is evidence that the cotton was damaged by a herbicide such as 2–4D, that the poison did not fall from the air, and that it was not present in the water from Potato Hill Bayou mixed with the insecticide.

One fact stands out as particularly important on the issue of causation. That is the statement by all the witnesses that the herbicide damage was uniform throughout the 45.6-acre tract and the

13. The court said at 268 P.2d 1041, 1048: "Keeping in mind the rule noted above that a disclaimer is to be strictly construed against the seller, we conclude that the Sherwin Williams disclaimer is insufficient to exclude the implied warranty of merchantable quality. The label, after describing the product and listing the ingredients, states merely that there is no warranty as to 'the use of this product' and that the buyer 'assumes all risk in use.' The description of the product on the label is in accord with the description of the spray which was ordered by plaintiffs, and the language of the disclaimer, when properly interpreted, is limited to a denial of any warranty that a substance which meets this description is an effective or safe insecti- cide. The language does not purport to disclaim the implied warranty that the substance in the drums actually meets the description of the product ordered by plaintiffs so as to be generally salable in the same manner as other products of the type described. More specifically, there is nothing in the disclaimer which suggests that Sherwin Williams was refusing to warrant that the liquid in the drums was compounded so as to conform with the description and was free from any impurity which would make it unsalable for the general purposes of a product of the kind ordered by plaintiffs. Accordingly, the trial court did not err in giving an instruction upon the implied warranty of merchantable quality."

North Quarter of the 19-acre tract and that there was only slight damage to the remainder of the 19-acre tract. The area severely damaged represents exactly the area that would be covered by two tankloads of spray. If, as the defendant argues, the sources of the herbicide was contamination of the equipment by Grey's brother, one would expect that the area covered by the second tankload would have been damaged less since the poison remaining in the tank after use by the brother would have been substantially diluted after the first tankload had been emptied. *The slightly damaged area covered by the third tankload indicates the effects of a diluted mixture of herbicide.* The theory which most naturally explains the uniformity of damage throughout the larger area is that the concentration of herbicide in the spray was restored after the first load had been emptied, which under the facts of this case could only have occurred if the herbicide came from the can of insecticide. This was a logical inference for the jury to draw from the facts. See Ford Motor Co. v. Mondragon, 8 Cir., 1959, 271 F.2d 342; Gearhardt v. American Reinforced Paper Co., 7 Cir., 1957, 244 F.2d 920; Mutual Life Ins. Co. of New York v. Hamilton, 5 Cir., 1944, 143 F.2d 726.

On the record before us, we hold that the district court properly submitted the issue of causation to the jury.

## CONCLUSION

We do not reach the question of the sufficiency of the evidence to support the plaintiff's contention that there was a valid settlement agreement.

We believe that no good purpose would be served by remanding this case for a new trial. The district judge's instructions worked to the advantage of the defendant. The judgment NOV was based on errors of law. Substantial evidence supports the verdict of the jury. Accordingly, we reverse the judgment below and direct that judgment be rendered for the plaintiff-appellant in accordance with the verdict of the jury.