GILLESPIE, Chief Justice:
Jody C. Reid and his wife, Mary F. Reid, and J. H. Blaylock, plaintiffs below and appellees here, sued Hinds-Rankin Metropolitan Water & Sewer Association, a corporation, defendant below and appellant here, for $80,000 damages. Plaintiffs alleged that about fifty-nine acres of ponds used for raising minnows were contaminated with sewage from defendant’s sewerage lagoons, resulting in damages in the loss of minnows and the diminished rental value of the ponds for several years. The jury returned a verdict in favor of the plaintiffs, Jody C. Reid and Mary F. Reid, for $10,000, and in favor of J. H. Blaylock for $30,000, and judgment was entered accordingly. Defendant appealed to this Court.
Blaylock acquired eighty acres of land in Rankin County and constructed ponds thereon for use in raising minnows for sale as bait. He operated these ponds for a number of years. In 1962, he became indebted to Jody C. Reid and his wife Mary F. Reidi to the extent of about $12,000. At that time Blaylock was ill and deeded the property to Mr. and Mrs. Reid with an oral agreement whereby Blaylock would continue in possession and have the full use and control of the property and the Reids would reconvey the property when their indebtedness was repaid with interest. There is no disagreement between the Reids and Blaylock.
. A limited amount of fresh water for the minnow ponds was obtained from several small wells on the eighty-acre tract. However, the major source of fresh water was obtained from certain canals, dikes and gates which had been constructed to enable water to run from nearby Neely Creek into the ponds. A large lift pump was required to finish filling the ponds inasmuch as the water would flow freely from the creek only up to a certain level.
The defendant operates two sewerage systems in the vicinity, one known as the Skyway Hills, which empties into an eight-acre lagoon used for treatment of the sewage, and the other known as Crest Park, which empties into a three and one-half acre lagoon. Skyway Hills lagoon is about one mile and a quarter from the plaintiffs’ minnow farm. The Crest Park lagoon is nearer plaintiffs’ land. Sewage is piped to and empties near the center of the lagoons and the action of various bacteria causes the solids to settle and the upper eighteen inches is supposed to be relatively clear water, except for bacteria and scum or algae on top. This top layer of water is known as “effluent” and while admittedly it contains bacteria, it is an accepted method of sewage treatment. The effluent from both of these lagoons drains off through a system of pipes into Neely Creek.
Prior to the two occurrences which brought about this lawsuit, Blaylock had furnished the defendant with a large valve and pipe to enable the effluent flowing from the Skyway Hills lagoon into Neely Creek to be cut off while he was catching water for his minnow ponds. Facilities were already available to control the drainage from Crest Park lagoon. The superintendent of the defendant had agreed that Blaylock could cut off the drainage from both lagoons when Blaylock was filling his minnow ponds, so long as it did not interfere wtih defendant’s cus *376 tomers. In the latter part of March 1968, Blaylock purchased a supply of brood minnows and placed them in a three-acre pond designed for holding the brood minnows. These minnows were sufficient at the normal hatching rate to furnish about six million minnows.
While drawing water from Neely Creek into about thirty acres of his minnow ponds, Blaylock had cut off the flow from the sewerage lagoons. With the drainage valves cut off, the water levels in the sewerage lagoons began rising. Without notice to Blaylock, defendant cut the levee of the Skyway Hills lagoon and released twenty-six inches of water and sewage from the eight-acre lagoon into Neely Creek, and thence into Blaylock’s minnow ponds. Blaylock was told that the dam had been cut the next day by the superintendent of defendant. Blaylock then went to the minnow ponds and saw that the ponds were filled with sewage, including paper and various other solids, together with scum on top and an offensive odor. Many of Blaylock’s minnows soon began dying, and the egg hatch dropped from a 90% to a 4% hatch.
A short time later, Blaylock purchased about 900 pounds of brood minnows and put them in one of the ponds that had not been contaminated. Blaylock plugged up the drainage from the Crest Park lagoon while drawing fresh water from Neely Creek, which had cleared up by then. However, defendant, again without warning, removed the plug from the three and one-half acre Crest Park lagoon, allowing effluent and sewage to be released into Neely Creek and from thence into the minnow ponds. The results were similar to the first instance affecting the remaining area of the minnow ponds, except for one four-acre pond.
The ponds were drained and dried out, and various chemicals were applied to the ponds and disked into the soil in an effort to remove the contamination resulting from the settlement of the sewage. Blaylock testified that even after the ponds had been treated with chemicals and lime, sewage would float to the top whenever water was emptied into the ponds. Blaylock stated that the ponds were unusable for raising minnows and that based upon his considerable experience in raising minnows, it would be approximately five years before the minnow ponds would be free of the contamination.
I.
Defendant assigns as error the action of the trial court in refusing to peremptorily instruct the jury to find for defendant as to the plaintiffs Jody C. Reid and Mary F. Reid. At the beginning of the trial, plaintiffs’ attorney stated that the Reids would not be present and that they had no monetary interest in the lawsuit. After being summoned by defendant, Mr. and Mrs. Reid testified in effect that in 1962 Blaylock was sick and they helped him out by lending him money; that Blaylock has had at all times the full right of possession and use of the land to do with as he saw fit. In sum, it appears from the testimony of Blaylock and Mr. and Mrs. Reid that the Reids hold title to the property as security for monies loaned Blaylock and that the Reids authorized Blaylock to prosecute this suit for damages to the land and the minnow operation. The record shows that the Reids do not claim any interest in the land or the lawsuit except that they expect his loan to be repaid with interest. There is no rational basis for awarding Mr. and Mrs. Reid separate damages in this case. This assignment has merit for a second and different reason. Plaintiffs’ claim on behalf of Mr. and Mrs. Reid is for permanent damage to the land, and the evidence shows only temporary damage to the land. Therefore, we hold that the trial court erred in refusing to peremptorily instruct the jury to return a verdict in favor of the defendant as to Mr. and Mrs. Reid, and the judgment in favor of them is hereby reversed and judgment entered for the defendant as against said parties.
*377 II.
Defendant assigns as error the refusal of a peremptory instruction as to the plaintiff Blaylock. It is argued that the land was owned in fee by Mr. and Mrs. Reid and that Blaylock had no interest in the lands and no riparian rights to the waters of Neely Creek. It follows, argues the defendant, that Blaylock has no cause of action and the court should have so held. One claiming riparian rights has the burden of showing that he has the right to use the waters of the stream in question. In this case the record owners, Mr. and Mrs. Reid, are parties to the suit and authorized Blaylock to prosecute the claim against the defendant. The Reids testified that Blaylock had the full rights to the use and possession of the land. The testimony shows clearly that Blaylock is the beneficial owner of the land and the interest of Mr. and Mrs. Reid is that of a mortgagee. At any rate, the Reids and Blaylock are the only persons who have any interest in the land and the minnow operation thereon and between them they have the right to sue for injury to the premises. Since there is no dispute between the Reids and Blaylock as to who has the right to recover for the claimed injury as a result of the acts of defendant, defendant may not take advantage of the unusual status of the title and right of possession and thus avoid liability. Especially is this true as long as the defendant is not subjected to any risk of liability to someone other than the plaintiffs in the present suit. Blaylock was in lawful possession of the land and he is entitled to recover for pollution of the water supply. 56 Am.Jur., Waters § 417 at 836 (1947). We therefore hold that the trial court properly refused the requested peremptory instruction as to Blaylock.
III.
Defendant assigns as error the admission of the testimony of J. C. Searcy, Jr., who testified as an expert witness concerning the fair rental value of the land. Searcy testified that the rental value of the land for raising minnows as it was developed at the time of the injury claimed by the plaintiffs, was $125 per acre per year. Mr. Searcy is a licensed real estate broker, but his experience in buying and selling real estate has been principally for himself. He testified that he was familiar with the real estate values in Rankin County, including the area where the subject land is located. Defendant emphasizes the fact that Searcy had never testified in any previous lawsuit. In our opinion prior court experience as a witness is not a prerequisite to the admission of a real estate broker’s testimony as an expert in land values. We hold that the trial court did not abuse its discretion in admitting Searcy’s testimony. Miss. State Highway Comm’n. v. Rhymes, 253 Miss. 577, 176 So.2d 326 (1965).
IV.
It is next contended that the trial court erred in sustaining objections to hypothetical questions propounded by the defendant to its witness McDonald, a chemist with the Sanitary Engineering Division of the Mississippi State Board of Health, and Mr. J. E. Johnston, a retired employee of the Division of Sanitary Engineers, State Board of Health. The question propounded to both witnesses called for an opinion as to whether the effluent from the two lagoons or effluent coming from septic tanks in the area caused the greater pollution of the stream in question. There was no factual basis for the witness to intelligently answer the questions. There was no showing as to the quantity or quality of the other possible two sources of water. We hold that the court did not abuse its discretion in ruling on these questions.
V.
Defendant asserts that erroneous instructions were given at plaintiffs’ request *378 and that the instructions are in hopeless conflict and were confusing to the jury. We are of the opinion that when read together the jury was not mislead. We find it unnecessary to discuss the instructions in detail because the overwhelming weight of the evidence established liability on the part of defendant, and if there was error in the instructions, they were harmless within the meaning of Miss.Sup.Ct. Rule 11. One of the principal questions argued under this assignment of error is the alleged failure of plaintiffs to show causal connection between the discharge from defendant’s lagoons and the damage to the land and minnows. This question is considered later under another assignment. We find no reversible error in the giving or granting of instructions to the jury.
VI.
Defendant also contends that the verdict of the jury is contrary to the overwhelming weight of the evidence. The argument on this assignment of error overlaps with that on several other assignments, and has four points of inquiry, which we next discuss.
(1) Defendant says there was no testimony offered by plaintiffs that any deleterious matter flowed from defendant’s lagoons into Neely Creek that damaged plaintiffs, because there was no expert testimony showing causal connection between the effluent running out of defendant’s lagoons and the damage done to plaintiffs’ land and minnows, and because no chemical analysis was made of the effluent. The defendant’s testimony as to the quality of the effluent flowing from the lagoons was based on the assumption that only eighteen inches off the top was released. On that basis, the expert testimony on behalf of defendant indicated that no solid matter would have flowed from the top eighteen inches. The testimony showed without dispute that defendant’s superintendent caused the levee to be cut on the Skyway Hills lagoon so that the contents of the lagoon would not cause the sewage to back up into the homes of defendant’s customers, and caused the pipe to be opened on the other lagoon. Blaylock, the only witness measuring with a ruler, testified that twenty-six inches of the contents of the Skyway Hills lagoon was released. Blaylock has had many years’ experience in raising minnows and his testimony indicates a substantial knowledge in that field.
The testimony on behalf of plaintiffs established by Blaylock and several other witnesses, including Jack Williamson, the pond management specialist for the Mississippi Game and Fish Commission, showed that the contents that flowed from the lagoons into Neely Creek and thence into plaintiffs’ minnow ponds, contained everything that is released from a household through the sewerage system, and that it was visible in the water in the minnow ponds, and that the odor was sufficient to attract buzzards. Williamson, who has had many years’ experience in managing fish ponds, said that minnows could not live in the water and that an observation of the condition of the water was sufficient for him to know that the minnows could not live in the ponds. Williamson did not make chemical analysis but made P¡H and oxygen tests.
The testimony of Williamson and Blay-lock is undisputed that the minnows began dying when the contents of the sewerage lagoons were turned into the minnow ponds, and we are of the opinion that the proof of causal connection was ample. Masonite Corp. v. Hill, 170 Miss. 158, 154 So. 295 (1934), Magnolia Petroleum Co. v. Stinson, 230 Miss. 533, 93 So.2d 815 (1957), and the recent case of Shell Oil Co. v. Ainsworth, 247 So.2d 815 (Miss.1971), all relied upon by the defendant, are not applicable to the particular facts of this case.
(2) The next point of inquiry under this assignment is the contention that if the waters of Neely Creek were in fact polluted by the emptying of the contents of the sewerage lagoons into the creek, the waters of the creek could have been polluted from several other sources, including run *379 off from numerous septic tanks in the area, and the general run-off in the area. Defendant relies upon our holding in Blizzard v. Fitzsimmons, 193 Miss. 484, 10 So. 2d 343 (1942), that no recovery can be had where there is no showing from which of several possible causes produced the injury where some of the causes do not involve the negligence of the party charged.
In the present case both instances of the flowage from the sewerage lagoons were followed immediately by the dying of minnows in the ponds of plaintiffs. There was no showing that any substantial contribution to the contaminated condition of the water resulted from septic tanks or the general overflow of surface waters. In the Blizzard case the evidence failed to show which of the several possible causes produced the injury. Here, the evidence is overwhelming that the contents of the sewerage lagoons was not a mere possible cause of plaintiffs’ injury, but was probably the only substantial source of contamination that caused the damage to the minnows and the land. We are, therefore, of the opinion that the Blizzard case is not applicable to the facts of this case.
(3) The third point of inquiry under this assignment is the contention that Blaylock had never been able to profitably raise minnows because his main source of water was Neely Creek, and minnows could not be profitably raised in creek water. Defendant offered testimony to this effect, but the witness who so testified also said that successful minnow raising operations had been conducted with creek water. The proof showed that prior to 1968, Blaylock had profitable years of raising minnows, and that the year 1968, when the events giving rise to this lawsuit occurred, was the first time that the ponds had been developed so that sixty-odd acres would be available for raising minnows. In our opinion, the fact that Blaylock may have been unsuccessful in some of his previous operations is not decisive.
(4) The next point of inquiry under this assignment of error is the contention that the contents of the sewerage lagoons were released because of Blaylock’s wilful act of stopping up the pipes and raising the water level in the sewerage lagoons, which required defendant to> cut the levee of the Skyway Hills lagoon and open the drain pipe of the Crest Park lagoon.
The proof showed without dispute that Blaylock and defendant’s superintendent had an agreement whereby Blaylock could cut off the drainage from the sewerage lagoons while he was catching water for his minnow ponds. Blaylock had furnished defendant’s superintendent with a pipe and valve for installation at the Skyway Hills lagoon. It is also undisputed that Blaylock was not notified when the contents of the lagoons were released into Neely Creek, although its superintendent testified he tried to notify Blaylock. However, defendant’s superintendent did not determine whether Blaylock was catching water in his minnow ponds when he released the contents of the lagoons. We are of the opinion that there is no merit in the contention that defendant was excused from contaminating Neely Creek because Blaylock had cut off the drainage.
VII.
A final contention of the defendant is that the damages awarded by the jury are grossly excessive. The argument on this assignment of error is based on the contention that (a) Blaylock had not profitably raised minnows in the past; (b) there was no showing what portion of plaintiffs’ damages was caused by effluent from defendant’s lagoons, and (c) because Searcy’s testimony regarding land values and land rental values was inadmissible. These three questions have already been discussed and in our opinion there is no reason why this Court should substitute its finding for that of the jury on the amount of damages.
The case is reversed and rendered as to the verdict in favor of Jody C. Reid and his wife, Mary F. Reid, and judgment is entered here for the defendant as to Mr. *380 and Mrs. Reid; the judgment in favor of Blaylock is affirmed.
Reversed and rendered as to the judgment in favor of Mr. and Mrs. Reid; affirmed as to judgment in favor of Blaylock.
JONES, PATTERSON, INZER and ROBERTSON, JJ., concur.